STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
REGINALD MC KNIGHT, DEFENDANT-APPELLANT.

Argued February 5, 1968—Decided June 3, 1968.

36

*Mr. Thomas J. Gunning* argued the cause for appellant.

*Mr. Robert H. Doherty, Jr.,* Ocean County Prosecutor, argued the cause for respondent.

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant McKnight was convicted of murder in the first degree and was sentenced to life imprisonment upon a jury's recommendation. *N. J. S. A.* 2*A*:113–4. He appealed directly to us under *R. R.* 1:2–1 (*c*) prior to the amendment of October 5, 1967.

The killing occurred in the course of a holdup. The deceased, Ronald Sandlin, age 18, was an attendant at a service station in Lakewood. McKnight knew the deceased well, they having been employed together at other places. Early on the morning of August 7, 1966 McKnight and one Charles Holland, with whose sister McKnight lived, went to the

service station to commit robbery. McKnight ordered gas and a new tire. After Sandlin affixed the tire, McKnight struck Sandlin on the head with the tire iron. Holland took the cash register. McKnight and Holland placed the unconscious victim in the car. When Sandlin regained consciousness and asked to be taken to a hospital, saying, "All the fun that we have had Reginald. Why do this?", McKnight assured him they would do so but after disposing of the cash register. The car was driven to a wooded area in the vicinity of McKnight's residence. Sandlin was ordered into the woods where he was shot by Holland. Later Sandlin was buried in a shallow grave dug by both assailants. McKnight and Holland divided the money taken from the cash register and also from the deceased's person. The rear seat and backrest, which were stained with blood, were removed, washed, and placed in the basement of a neighbor's home.

McKnight was caught in this way: At 4:30 A.M., just prior to the holdup, Officer Gomez, riding his patrol car, saw two vehicles at the service station. One was a 1955 green and white Ford. At 4:45 A.M. the officer drove into the station, at which point the Ford was jacked up. McKnight and Holland both were there but the officer did not observe them sufficiently to identify either. At 5:00 A.M. a customer, finding the station unattended, sought a policeman. He met Officer Gomez who immediately went to the scene. A trail of blood was found and the absence of the cash register was noted.

The police checked the summons file and located one recently issued on a 1955 green and white Ford owned by McKnight. They went to Manchester Township where McKnight lived and at about 9:00 P.M. on August 8 found the car in the woods, some 50 yards from the road. The car was concealed by some brush used as camouflage. An examination by flashlight from the outside revealed a tire with apparent blood stains in the interior of the car, the absence of the rear seat and backrest, and the presence of a fingerprint on the left rear hubcap. The hubcap was removed

about an hour after the car was found, and examination later proved the fingerprint was the victim's. The rear seat and backrest were recovered from the home of a neighbor where McKnight had left them, and an examination revealed blood of the same type as the deceased's.

Searching the woods, the police found the cash register, and finally at 7:00 A.M. on the 9th they came upon freshly disturbed earth, beneath which was the body of Sandlin. With the body were the victim's wallet and a discharged shell. Later defendant was apprehended. He confessed, naming Holland as the one who fired the shots. Through his confession the gun was found. An expert testified the shell found with Sandlin's body had been fired by it.

There was also evidence of incriminating statements by McKnight to residents in the area.

McKnight's guilt of this murder was established overwhelmingly. Indeed guilt was not really questioned at trial or before us. Nonetheless McKnight says he must be set free because certain evidence, the truthfulness of which is not at all challenged, was obtained, he claims, in violation of constitutional guarantees.

I

The first issue involves the admissibility of defendant's confession.

Defendant was arrested in Asbury Park at about 11:00 P.M. on August 9. At 12:30 or 12:45 A.M. on the 10th he was turned over to Ocean County authorities, who took him to Lakewood. The party reached Lakewood at 1:30 A.M. and defendant was immediately brought before a magistrate. The magistrate advised defendant of his right to counsel and that counsel would be appointed if he could not afford one. Defendant said he wanted an attorney and the magistrate said one would be appointed. The magistrate advised defendant of his right not to make a statement and that "if you do, anything you say may be held against you and in the future," to which defendant replied that he understood.

Mr. Doherty, the prosecutor, then gave all of the warnings required by *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966). Defendant obviously understood, and said "I would like a lawyer present before I answer any questions." The record before the magistrate then reads:

"Mr. Doherty: And I want one other thing clear on the record. Have you answered any questions since you have been in custody, about these complaints, to anyone?

The Defendant: Well, in Asbury Park they tried to ask me a couple of questions and—

Mr. Doherty: Did you give them any answers?

The Defendant: No, sir.

Mr. Doherty: All right.

The Defendant: I answered a few questions, but that was it. I figured like I was entitled to be represented—

Mr. Doherty: Right.

The Defendant: (Continuing)—because I know of a few cases where you were not represented and if you say something they can twist it—they twist it around.

\* \* \* \* \* \* \*

Mr. Doherty: We are not going to ask you any questions because you told us that you want a lawyer before you do. All I am asking you now is did you answer any questions since you have been in custody—did anybody ask you questions, about these offenses, that you answered?

The Defendant: About the offenses?

Mr. Doherty: Yes.

The Defendant: No, sir.

Mr. Doherty: So, so far you haven't given any statement to anybody and you don't intend to give one until you have a lawyer?

The Defendant: They asked me questions but I refused to answer them.

Mr. Doherty: All right."

Defendant was given copies of the complaints for robbery and murder in the presence of the magistrate. Defendant was placed in the Ocean County jail. The authorities made no attempt to question him.

At 9:00 A.M. on the 10th defendant executed a form application for assignment of counsel. At noon of that same day defendant asked a jail guard to deliver a note to the prosecutor. It read:

"I was suppose to meet Charles Holland in Newark at the Open End Bar located on Market and Adams Street this Friday or Saturday night. Please take him alive for he is the one that can free me of one of the complaint against me. He might be to his cousin house however I do not know the address. If possible I would like to see the Prosecutor for the State. He told me his name in Court however I forgot it. This is very very important that I see him right away for he wanted me to answer some question in Court but I was to drunk to answer them. So if I may see him tomorrow or Friday morning I can answer the question that he wanted to know. Thank you very much."

As a result of this note defendant was taken that same day to the courthouse where at 4:30 P.M. an assistant prosecutor, referring to defendant's note, again fully advised him in harmony with *Miranda,* and defendant stating his desire to tell what he knew without the aid of counsel, Lt. Herbert of the prosecutor's staff undertook to interrogate him. Preliminarily Lt. Herbert also repeated the *Miranda* warnings. An oral confession ensued, following which defendant led the officers to the place where he had hidden the murder weapon. At about 8:30 P.M. defendant was again interrogated before a certified shorthand reporter for the purpose of reducing the oral confession to writing.

Neither defendant nor the prosecutor's office knew that an attorney had been appointed by the court at about 4:15 P.M. It does not appear when assigned counsel was notified or when he responded to the assignment, but it is clear that the attorney did not try to reach defendant or the prosecutor until some day after the day on which the confession was made. There can be no suggestion that the State sought to overreach defendant in any way. The prosecutor scrupulously respected defendant's right to counsel and accepted defendant's confession only after defendant himself, fully advised of his rights, said he wanted to talk. Defendant, age 29, was a high-school graduate. He does not claim any mistreatment, or any pressure to speak. His decision was plainly voluntary in the usual sense of that word, and was motivated by what defendant conceived to be his own self-interest. Holland, who had actually fired the shots accord-

ing to defendant, was at large. Defendant obviously believed his predicament would be worse if he alone were called to account. It may well be that his judgment was correct, since the jury recommended life imprisonment whereas Holland, after a separate trial, was sentenced to death.

Nonetheless, defendant contends, first, that the fact that counsel had been appointed itself operated to bar the interview notwithstanding defendant himself initiated the interview and pressed for it to protect his own interests as he saw them.

There was no purpose to interfere with the relationship of attorney and client. There was no trace of the conduct condemned in *Massiah v. United States,* 377 *U. S.* 201, 84 *S. Ct.* 1199, 12 *L. Ed. 2d* 246 (1964), where the Government, after indictment and the retention of defense counsel, in substance . interviewed the accused in the absence of his attorney through the medium of a faithless confederate and "bugged" the conversation. Nor does the situation come within *State v. Green,* 46 *N. J.* 192 (1965), *certiorari* denied, 384 *U. S.* 946, 86 *S. Ct.* 1475, 16 *L. Ed. 2d* 544 (1966), where we said that *Massiah* precluded any interrogation of the accused after his indictment "even where the statement is voluntarily given" (*p.* 200) in the sense that it was given without coercion. We did not say that a defendant, aware of his right to counsel, could not choose to talk. We there expressly pointed out that since defendant had not been informed by the interrogator of his right to counsel and that counsel would be assigned if he was indigent, it could not be inferred that he "waived his constitutional right to the assistance of an attorney" (*p.* 200).

The statement in *Miranda* that "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning," 384 *U. S.,* at *pp.* 444–445, 86 *S. Ct.,* at *p.* 1612, 16 *L. Ed. 2d,* at *pp.* 706–707, does not mean that if the prisoner once says he wishes an attorney, he thereby disables himself from taking another course. On the con-

trary, the quoted statement means only that the prisoner's request for counsel must be respected, and the interrogation may not be continued in the face of that request. But the prisoner remains free to change his mind, and to elect to make a clean breast, as the defendant here did. The question whether in fact defendant did waive his right to counsel is another matter, to which we will presently turn. The immediate point is that a request for counsel does not *per se* disable an accused from thereafter waiving counsel. Nor can the State be charged with dirty business within *Massiah* when, unaware that counsel had been assigned, it accepted the statement the accused volunteered to give.

We turn then to the question whether defendant "waived" his right to the aid of counsel under *Miranda*. Defendant argues that "he lacked sufficient knowledge to intelligently and knowingly waive his constitutional rights." To understand the point, we resume the factual narrative.

As noted above, after defendant made a complete oral confession and led the officers to the recovery of the gun, the officers undertook to have defendant repeat his confession before a certified shorthand reporter to make a record of it. The interrogator repeated the *Miranda* warnings which had already been given some four times. The transcript of that interview reads:

"Question: Have I warned you previously today of your rights after you had been arrested?
Answer: Yes, sir.
Question: I am going to warn you again of those. Now, you understand you have absolute constitutional rights to remain silent. Do you understand that, Reg?
Answer: Yes, sir.
Question: I would like to ask you some questions.
Answer: All right.
Question: If you answer my questions, in spite of your right to remain silent, the answers you give can and may be used against you in the event of a criminal trial. Do you understand this, Reg?
Answer: Yes, sir.
Question: You have a right to consult with counsel prior to this interrogation *and to have counsel present during any interrogation*, do you understand that?

Answer: Yes, sir.

Question: If you wish to exercise this right to counsel, but you do not have funds sufficient to pay counsel, the Court will appoint counsel for you. Do you understand that?

Answer: Yes, sir.

Question: Have you applied for counsel to represent you?

Answer: We took care of that today, I think.

Question: You took care of that today?

Answer: Yes, sir.

Question: Knowing you have a right to remain silent and if you answer questions your answers may be held against you, and knowing you have a right to counsel and to consult with counsel before any interrogation, *to have counsel present during interrogation*, and that if you don't have the money the Court will pay a lawyer to represent you or appoint a lawyer to represent you, do you wish to waive these rights and answer the questions I am going to ask you?

Answer: Do you mean—

Question: Do you wish to answer the questions I am going to ask you *without any attorney being present?*

Answer: Yes, I will answer them.

Question: You will answer them?

Answer: Yes." (Emphasis added.)

Defendant refers to the uncompleted answer "Do you mean —" near the end of the foregoing excerpt. At the trial he undertook to state the uncertainty he then had in mind. We are not sure we understand him. His counsel in the brief before us reads his explanation to deal with "his confusion as to when or where he had the right to a lawyer's presence." If defendant meant by his testimony that he did not know he could have an attorney present when he answered questions, that testimony could not be believed. The transcript quoted immediately above is too explicit to tolerate any such claim. We note, too, that the transcript of the appearance before the magistrate, mentioned earlier, is equally clear, the prosecutor saying to defendant in the magistrate's presence:

"Now, in addition to that, before you answer any questions which I have asked you to answer, you also have a right to have the lawyer you have appointed right present with you if you were to answer any questions of the Prosecutor's office or any policeman. You have a right to have the lawyer right with you,"

to which defendant answered "I would like to see him now." The magistrate explained that was impossible, because the appointment of counsel would be made by the assignment judge or the county court. Then asked by the prosecutor, "Do you want a lawyer present before you answer any questions or will you answer some questions before you have a lawyer present?", defendant replied "I would like to have a lawyer present before I answer any questions." Again, the assistant prosecutor testified that when he met with defendant in response to defendant's note asking for the meeting, "I told him that he was also entitled to the services of an attorney and that if he could not afford one, one would be appointed to represent him and that that attorney could be present at any time, including the time that I was talking with him. He said he understood that." We are thoroughly satisfied that defendant understood that counsel could be present during any interrogation he might choose to undergo.

The transcribed confession ends this way:

"Question: After this has been transcribed you can read it. You will have an opportunity to read it.
Answer: All right, sir.
Question: And if it is true and correct will you be willing to sign it?
Answer: Yes, sir.
DETECTIVE HERBERT: Time completed—
Answer: Before I sign it can my attorney read it? Before I sign it I would like for him to read it. O. K.?
Question: Yes, sir.
DETECTIVE HERBERT: Time completed, 9:14 P. M."

The statement was never signed. Defendant says the waiver was not "intelligently" made because he thought his word could not be used against him unless reduced to a writing signed by him. In point of fact, the claim cannot be credited. The warnings were perfectly clear that anything he said could be used against him. It is absurd to suppose that a man who confessed and led the police to the murder weapon could have thought that none of that would matter if he declined to sign a statement embodying what he had said and

done. Rather his request at the end of the statement that his attorney see it before it is signed reflected a desire to be assured that it fairly related his version of the criminal event, thus echoing what defendant told the magistrate when he said "I figured like I was entitled to be represented * * * because I know of a few cases where you were not represented and if you say something they can twist it — they twist it around." It is of no moment that the prosecution did not bother to cross-examine defendant with respect to his alleged misconception or that no witness testified that defendant had affirmatively revealed a correct understanding. The nature of the warnings given require a finding that defendant knew the spoken word could involve him.

Thus defendant's claim must be rejected as a matter of fact. It must also be rejected as a matter of law. Specifically, if a prisoner is told that he has a right to say nothing and that what he says may be used against him, and that he has a right to an attorney and to his presence during any interrogation, at public expense if he is indigent, the objective of *Miranda* is fully met. It is irrelevant that the prisoner, so advised, chooses to speak without counsel because he misconceives his need for aid or the utility of a lawyer. That this is so becomes apparent from reflection upon what is involved.

Sundry rights are embedded in the Constitution to establish their timeless worth. In a given case, other rights, not thus secured from change or abolition, may in fact be of more moment. Yet such rights may be lost if not asserted, and no inquiry will lie as to whether the litigant knew of, or intended to forego, the advantage or protection he could have claimed. The Constitution does not provide otherwise as to the rights it embodies. It would not offend the language of the Constitution in the least to say that it merely protects those rights from legislative destruction or dilution. Nonetheless there is a court-made doctrine which, in circumstances not yet fully defined, would protect the individual from the loss of constitutional rights despite his failure to assert them.

■ This doctrine is called "waiver." The term is rarely a shaft of light. Here, as in other settings, "waiver" is more apt to state a result than to show the way to it. It may describe an election deliberately made with awareness of everything involved; it may also rest upon nothing more than an omission to act. What constitutes a "waiver" of a constitutional right must depend upon the values involved in each specific setting.

■ Thus our rules of court provide that the right to trial by jury in a civil case must be asserted by affirmative demand. *R. R.* 4:39–3. The "waiver," if one wishes to speak of a loss of the right in such terms, does not depend upon the deliberate choice of the litigant, or even his awareness of the rule requiring the demand. The litigant may be relieved of the error, but not because the Constitution so ordains. So in criminal matters, we have rules within which a defendant must assert his rights, even though they be of constitutional origin. A motion to suppress evidence obtained in violation of the Fourth Amendment must be made before trial, *R. R.* 3:2A–6(a), notwithstanding that the defendant prefers to raise the issue at another time and insists he does not intend to forego it. If a defendant challenges a confession, he must do so at a time and in a mode we prescribe; he may not reserve the issue for a post-conviction proceeding. A defendant must object to evidence when it is offered, and to the charge to the jury immediately after it is delivered, and although he may be relieved of his failure for "plain error," relief depends upon the justice of the case and not upon whether the objection which should have been made has a constitutional tone. A defendant must advance before judgment every available contention, and if he wishes to complain of error in the trial or pretrial process, he must do so by direct appeal. *R. R.* 3:10A–3. In short, there must be order in the judicial process, and constitutional rights may be lost if they are not advanced in accordance with rules which afford a fair opportunity to press them. See *R. R.* 3:10A–4. We thus accord to our judgments the same finality the federal

courts, if we understand their practice, give their own judgments in federal criminal prosecutions, and we do so even though the federal courts may feel obliged to deny such finality to our judgments under *Townsend v. Sain,* 372 *U. S.* 293, 83 *S. Ct.* 745, 9 *L. Ed. 2d* 770 (1963), and *Fay v. Noia.* 372 *U. S.* 391, 83 *S. Ct.* 822, 9 *L. Ed. 2d* 837 (1963).

Here we are dealing with the privilege against self-incrimination and the incidental right to the aid of counsel. Speaking of custodial interrogation, *Miranda* said (384 *U. S.,* at *p.* 444, 86 *S. Ct.,* at *p.* 1612, 16 *L. Ed. 2d,* at *p.* 706) :

"\* \* \* As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. \* \* \*"

*Miranda* places "a heavy burden \* \* \* on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" and adds that the Court "has always set high standards of proof for the waiver of constitutional rights," 384 *U. S.* at 475, 86 *S. Ct.* at 1628, 16 *L. Ed. 2d* 724. At that point *Miranda* cites *Johnson v. Zerbst,* 304 *U. S.* 458, 58 *S. Ct.* 1019, 82 *L. Ed.* 1461 (1938). It is therefore appropriate to turn to *Johnson v. Zerbst* in seeking the understanding requisite for an intelligent waiver under *Miranda.*

In *Johnson v. Zerbst* the setting was the trial of a criminal charge upon a plea of not guilty. The Court deemed the presence of counsel at trial to be so fundamental that the failure to provide counsel constituted a "failure to complete the court," (304 *U. S.,* at *p.* 468, 58 *S. Ct.,* at 1019, 82 *L. Ed.,* at *p.* 1468), a jurisdictional defect, unless the de-

fendant waived his right to counsel. The Court said, "A waiver is *ordinarily* an intentional relinquishment or abandonment of a known right or privilege" (304 *U. S.,* at *p.* 464, 58 *S. Ct.,* at *p.* 1023, 82 *L. Ed.,* at *p.* 1466; emphasis ours), and directed a hearing in which the burden of persuasion, the proceeding being a collateral attack by *habeas corpus,* was upon the defendant to show "that he did not competently and intelligently waive his right to counsel" (304 *U. S.,* at *p.* 469, 58 *S. Ct.,* at *p.* 1025, 82 *L. Ed.,* at *p.* 1469). Although the case involved a federal prosecution, the same concept of "waiver" has been applied to the right to counsel at the *trial* of a State criminal charge. See *Carnley v. Cochran,* 369 *U. S.* 506, 82 *S. Ct.* 884, 8 *L. Ed. 2d* 70 (1962).

Neither *Johnson v. Zerbst* nor *Carnley v. Cochran* reveals the nature of the understanding required for a competent and intelligent waiver in the setting before them. Both cases discuss the intricacies of the criminal charges involved, thereby demonstrating the need for counsel, but neither case says whether the defendant must be aware of all the specific hazards and be able personally to cope with them.

The object of a trial being a truthful verdict, the desirability of counsel is plain. So, when a defendant offers to plead guilty without the advice of counsel, again justice is served only if the plea is true. The issue of waiver of counsel in that context was involved in *Von Moltke v. Gillies,* 332 *U. S.* 708, 68 *S. Ct.* 316, 92 *L. Ed.* 309 (1948). There defendant forewent counsel and pled guilty to an involved federal charge of conspiracy to violate the espionage act. On *habeas corpus,* defendant said she did so because of erroneous advice of an F.B.I. agent as to what constituted culpable involvement. A majority of the Court ordered a hearing upon that factual assertion, but in an opinion in which only three other justices joined, Mr. Justice Black said (332 *U. S.,* at *p.* 724, 68 *S. Ct.,* at *p.* 323, 92 *L. Ed.,* at *p.* 321) :

"To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and *wisely* made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." (Emphasis ours.)

Although some other tribunals have alluded to all or a portion of it,[1] Mr. Justice Black's test of waiver of counsel where a plea of guilty is entered has never been embraced by a majority of the Supreme Court. His test is quite exacting in its detail, and the requirement that the waiver be "wise," if the word was used in its usual sense, could present difficulty.[2] But it may be doubted that Mr. Justice Black would have offered the same definition of waiver where a defendant denies guilt and insists upon trying his own case, for it would require the accused to lay bare the details of his defense, and it is hard to imagine any case in which a court could find it "wise" for a layman to defend himself.[3] At any rate, at the trial stage the aim

---

[1] *Jenkins v. State*, 57 *N. J. Super.* 93, 124 (*App. Div.* 1959), reversed, 32 *N. J.* 109 (1960) ; *United States ex rel. Ackerman v. Russell*, 388 *F. 2d* 21, 23 (3 *Cir.* 1968) ; *Day v. United States*, 357 *F. 2d* 907, 910 (7 *Cir.* 1966) ; *Aiken v. United States*, 296 *F. 2d* 604 (4 *Cir.* 1961) ; *United States ex rel. Wright v. Myers*, 265 *F. Supp.* 483 (*E. D. Pa.* 1967) ; *Clark v. State*, 388 *P. 2d* 816, 822 (*Alaska Sup. Ct.* 1964) ; *Ebsersole v. State*, 91 *Idaho* 630, 428 *P. 2d* 947, 949 (*Sup. Ct.* 1967) ; *Bundrant v. Fogliani, Nev.*, 419 *P. 2d* 293 (*Sup. Ct.* 1966) ; *People v. Seaton*, 19 *N. Y. 2d* 404, 280 *N. Y. S. 2d* 370, 227 *N. E. 2d* 294 (*Ct. App.* 1967) ; but see *Carter v. State*, 243 *Ind.* 584, 187 *N. E. 2d* 482, 483 (*Sup. Ct.* 1963) ; *People v. Wurtz*, 1 *Mich. App.* 190, 135 *N. W. 2d* 579, 584 (*Ct. App.* 1965).

[2] We note that Federal Criminal Rule 11 now provides that "The Court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

[3] But see *Commonwealth v. Murphy*, 210 *Pa. Super.* 524, 233 *A. 2d* 594 (*Super. Ct.* 1967), and *Commonwealth ex rel. McCray v. Rundle*, 415 *Pa.* 65, 69, 202 *A. 2d* 303, 305 (*Sup. Ct.* 1964), which invoked Mr. Justice Black's opinion in *Von Moltke* although the issue was waiver of counsel at a trial rather than on a plea of guilty.

is a truthful judgment, and hence a defendant should at least be warned in general terms of the desirability of professional representation and of the general perils of going it alone.

The case at hand involves, not the trial stage, but rather the detectional stage of law enforcement. Truth here is the aim as it is at the trial stage, but rights suitable to assure the truth at trial could block it during an investigation. Different values are involved. When the guilty go undetected, or, if detected, are nonetheless set free because plain evidence of guilt is suppressed, the price is exacted from what must be the first right of the individual, the right to be protected from criminal attack in his home, in his work, and in the streets. Government is constituted to provide law and order. The Bill of Rights must be understood in the light of that mission.

██ There is no right to escape detection. There is no right to commit a perfect crime or to an equal opportunity to that end. The Constitution is not at all offended when a guilty man stubs his toe. On the contrary, it is decent to hope that he will. Nor is it dirty business to use evidence a defendant himself may furnish in the detectional stage. Voluntary confessions accord with high moral values, and as to the culprit who reveals his guilt unwittingly with no intent to shed his inner burden, it is no more unfair to use the evidence he thereby reveals than it is to turn against him clues at the scene of the crime which a brighter, better informed, or more gifted criminal would not have left. Thus the Fifth Amendment does not say that a man shall not be permitted to incriminate himself, or that he shall not be persuaded to do so. It says no more than that a man shall not be "compelled" to give evidence against himself.

██ Hence while we are solicitous of the right to counsel at the trial stage to the end that a defendant shall not suffer injustice because he is not equipped to protect himself, it would be thoughtless to transfer the same right to

counsel to the detectional scene.[4] If it be granted that a man may seek legal advice as to how to avoid detection, it is not because the Constitution guarantees him that right. Surely *Miranda* does not say that a man's deed or word may not be used against him merely because he was unaware of its incriminating thrust, *State v. Aiken, Wash.*, 434 P. 2d 10, 26 (*Sup. Ct.* 1967), or unless he first rejected an opportunity for advice by counsel. *Cf. Ballay v. People, Colo.*, 419 P. 2d 446 (*Sup. Ct.* 1966). A man could not escape his confession to a friend or relative because he thought that what he said did not constitute proof of a crime or that the friend or relative could not testify against him. It is consonant with good morals, and the Constitution, to exploit a criminal's ignorance or stupidity in the detectional process. This must be so if Government is to succeed in its primary mission to protect the first right of the individual to live free from criminal attack.

---

4 We note, without exploring the subject, that although the cases are already in disagreement, there is no rush to find that a consent to a search, if not coerced, will fall if the consent is obtained without warnings as to the Fourth Amendment rights. Again the values involved are different. The probative value of what is seized is not tainted by any risk of "coercion." Further, the rule of exclusion, devised to deter insolence in office, is of questionable relevancy when the officer requests and receives permission to search. The following cases hold that no warning is needed: *Rosenthall v. Henderson*, 389 F. 2d 514 (6 Cir. 1968) ; *Gorman v. United States*, 380 F. 2d 158 (1 Cir. 1967) ; *People v. Dahlke*, 64 Cal. Rptr. 599 (*Dist. Ct. App.* 1967) ; *People v. Campuzano*, 61 Cal. Rptr. 695 (*Dist. Ct. App.* 1967) ; *People v. Roberts*, 246 Cal. App. 2d 715, 55 Cal. Rptr. 62 (*Dist. Ct. App.* 1966) ; *State v. McCarty*, 199 Kan. 116, 427 P. 2d 616 (*Sup. Ct.* 1967) ; *Morgan v. State*, 2 Md. App. 440, 234 A. 2d 762 (*Ct. Spec. App.* 1967) ; *Lamot v. State*, 2 Md. App. 378, 234 A. 2d 615 (*Ct. Spec. App.* 1967) ; *State v. Forney, Neb.*, 157 N. W. 2d 403 (*Sup. Ct.* 1968) ; *State v. Forney*, 181 Neb. 757, 150 N. W. 2d 915 (*Sup. Ct.* 1967). *Contra: United States v. Nikrasch*, 367 F. 2d 740 (7 Cir. 1966) ; *United States v. Moderacki*, 280 F. Supp. 633 (*D. Del.* 1968) ; *United States v. Blalock*, 255 F. Supp. 268 (*E. D. Pa.* 1966). Failure to warn, although not prerequisite, was deemed pertinent to an inquiry as to voluntariness of consent, in *People v. Roberts, supra.*

54

As we understand *Miranda*, its focus was upon the right not to be "compelled" to incriminate one's self and upon nothing else. *Miranda* did not find that the constitutional right to counsel which exists at the trial stage obtains with the same sweep during the State's pretrial investigation. On the contrary, *Miranda* expressly sustains confessions made by a suspect who is not in "custody or otherwise deprived of his freedom of action in any significant way" (384 *U. S.*, at *p.* 444, 86 *S. Ct.*, at *p.* 1612, 16 *L. Ed.* 2d, at *p.* 706), notwithstanding there was no counsel, or advice as to a right to counsel, or even an awareness of the Fifth Amendment privilege. The warning *Miranda* requires with respect to the right to counsel was fashioned, as we understand the opinion, solely to counteract the coercion of custodial interrogation. The prisoner so situated is to be advised of a right to counsel to the end that he will feel free to say nothing which may incriminate him. Accordingly *Miranda* expressly says that the warnings it devised need not be given if "other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it" (384 *U. S.*, at *p.* 444, 86 *S. Ct.*, at *p.* 1612, 16 *L. Ed.* 2d, at *p.* 706).

Nor does *Miranda* say that the test of "waiver" is the one applicable when the issue is the right to counsel at trial or on a plea of guilty. On the contrary, *Miranda* says that if the defendant is told of his "right to silence," of the hazard of incrimination if he speaks, and of his right to a lawyer's presence, at public expense if he is indigent, then "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." 384 *U. S.*, at *p.* 475, 86 *S. Ct.*, at *p.* 1628, 16 *L. Ed.* 2d, at *p.* 724. See *State v. Yough*, 49 *N. J.* 587, 596–597 (1967); *Tucker v. United States*, 375 *F.* 2d 363 (8 *Cir.* 1967). Nowhere does *Miranda* suggest that the waiver of counsel at the detectional stage would not be "knowing" or "intelligent" if the suspect did not understand the law relating to the crime, the pos-

sible defenses, and the hazards of talking without the aid of counsel, or if the suspect was not able to protect his interests without such aid, or, in terms of the plurality opinion in *Von Moltke,* if it was not "wise" of the prisoner to forego counsel or the right to silence. See *People v. Lara,* 62 *Cal. Rptr.* 586, 432 *P. 2d* 202, 210 (*Sup. Ct.* 1967); *State v. Aiken, supra, Wash.,* 434 *P. 2d* 10, 26, 33; *cf. People v. Roman,* 64 *Cal. Rptr.* 268 (*Dist. Ct. App.* 1967); *People v. Lux,* 289 *N. Y. S. 2d* 66 (*Co. Ct.* 1967). However relevant to "waiver" of the right to counsel at trial or in connection with a plea of guilty, those factors are foreign to the investigational scene where the detection of the guilty is the legitimate aim.

 Hence if a defendant was given the *Miranda* warnings, if the coercion of custodial interrogation was thus dissipated, his "waiver" was no less "voluntary" and "knowing" and "intelligent" because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. A man need not have the understanding of a lawyer to waive one. Such matters, irrelevant when the defendant volunteers his confession to a friend or to a policeman passing on his beat, are equally irrelevant when the confession is made in custody after the coercion of custodial interrogation has been dispelled by the *Miranda* warnings. With such warnings, the essential fact remains that defendant understood he had the right to remain silent and thereby to avoid the risk of self-incrimination. That is what the Fifth Amendment privilege is about.

 Here the defendant does not dispute that he knew he need not speak. He does not suggest that he was coerced because of the fact of custody. It would be absurd to say that a man who, fully warned, initiated an offer to confess to the end that his confederate might not escape, thereby to

serve the defendant's own interests, is entitled to have the confession suppressed and to be set free.

## II

As stated earlier, the automobile used in the robbery and murder was found partially concealed in a wooded area. Within an hour the left rear hubcap was removed because it had a visible fingerprint which the authorities correctly apprehended was made by the deceased. In the interior of the car and visible from the outside was a tire stained with what appeared and proved to be blood. Two days later the police removed the left rear wheel and tire. There was a seasonable motion to suppress the evidence thus obtained, which was denied. At the trial, the court excluded the left rear wheel with tire because of the failure to obtain a search warrant in the two-day interval between the seizure of the vehicle and their detachment from it. The sole issue before us is whether the trial court correctly held that no search warrant was needed for the removal of the hubcap and the examination of the fingerprint. The trial court's ruling was correct for the reasons about to be stated, and for the same reasons the trial court should not have excluded the wheel and tire, but, of course, of this the defendant cannot complain.

Defendant does not question the seizure of the vehicle itself, or question the right to examine the fingerprint while the hubcap remained a part of it. The challenge goes solely to the separation of the hubcap from the vehicle without a search warrant. But there was no search within the meaning of the Fourth Amendment; there was no intrusion into an area protected by it. The hubcap and the fingerprint were in clear view. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States,* 390 *U. S.* 234, 88 *S. Ct.* 992, 19 *L. Ed. 2d* 1067 (1968). See

*State v. Smith,* 37 *N. J.* 481, 496 (1962), *certiorari* denied, 374 *U. S.* 835, 83 *S. Ct.* 1879, 10 *L. Ed.* 2d 1055 (1963); *State v. Mark,* 46 *N. J.* 262, 275 (1966); *State v. Griffin,* 84 *N. J. Super.* 508, 519 (*App. Div.* 1964); *State v. Puryear,* 94 *N. J. Super.* 125, 135 (*App. Div.* 1966), certification granted to State but denied to defendant, 49 *N. J.* 365 (1967).

It seems to us that the same result should be reached even on the hypothesis that a "search" was involved. Having been used as an instrument of the crimes of robbery and murder, the automobile was lawfully seized to be retained for its evidential worth. In *Cooper v. State of California,* 386 *U. S.* 58, 61, 87 *S. Ct.* 788, 17 *L. Ed.* 2d 730, 733 (1967), it was held that the State could search without a warrant an automobile seized as evidence in connection with a narcotics arrest even though the search was made a week after the arrest. Whether that case will support the thesis that a search may be made without a warrant of any automobile used as an instrumentality of crime may be debatable. Before *Cooper, in Harris v. United States,* 125 *U. S. App. D. C.* 231, 370 *F.* 2d 477 (1966), the Court of Appeals, *en banc,* declined to decide whether an automobile, seized as an instrumentality of crime, may on that basis be searched without a warrant. The court found there was no search because the evidence came into plain view when the officers opened the door of the car for an acceptable reason. That decision was affirmed on the same thesis, after *Cooper,* in *Harris v. United States,* cited in the paragraph immediately above.

▮▮▮▮▮ Here, as in *Harris,* the issue need not be met, but nonetheless we think it sound to say that an automobile, seized as an instrument of crime, may be examined or searched without a warrant. See *Johnson v. State,* 238 *Md.* 528, 209 *A.* 2d 765, 770 (*Ct. App.* 1965); *Abrams v. State,* 223 *Ga.* 216, 154 *S. E.* 2d 443 (*Sup. Ct.* 1967); cf. *People v. Talbot,* 51 *Cal. Rptr.* 417, 414 *P.* 2d 633, 644–645 (*Sup. Ct.* 1966). Surely a search warrant is not necessary to ex-

amine or to test a weapon, or to open the brown bag or valise seized as an instrument used in a bank robbery to see if the stolen money is there. There is no reason to treat an automobile differently from any other chattel employed to commit crime. The question is whether such a search is "unreasonable," the final standard under the Fourth Amendment. *State v. Boykins,* 50 *N. J.* 73, 81 (1967). We see nothing unreasonable about it. There is no threat to the values protected by the Fourth Amendment when the vehicle that is searched was used to accomplish a crime and was seized on that account.[5] In those circumstances an application for a warrant would be rather ritualistic; and to suppress the truth and release the guilty because that step was not taken would be an extravagant gesture. We think it is better to deal with the problem of the automobile in the direct terms we have suggested. The alternative probably would be a run of doubtful distinctions.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.

---

[5] Since the preparation of this opinion, *Dyke v. Taylor Implement Mfg. Co.,* 391 *U. S.* 216, 88 *S. Ct.* 1472, 20 *L. Ed.* 2d 538 (May 20, 1968), was handed down. We read it to support a warrantless search of an automobile seized as an instrumentality of crime. The opinion concludes with a reservation as to the impact of the removal of a car upon the warrantless search, but the reservation seems not to apply to the search of a vehicle itself seized as an instrumentality of crime and held for its evidential value.