Wladyslaw SLEZIAK, a/k/a Walter Sleziak, Appellant,

v.

STATE of Alaska, Appellee.

No. 955.

Supreme Court of Alaska.

May 5, 1969.

Chancy Croft, of Croft & Bailey, Anchorage, for appellant.

Douglas B. Bailey, Dist. Atty., Leroy J. Barker and J. Justin Ripley, Asst. Dist. Attys., Anchorage, for appellee.

## OPINION

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

RABINOWITZ, Justice.

The principal contention in this appeal centers on the trial court's overruling of appellant's motion to suppress evidence which was allegedly obtained as the result of an illegal search and seizure.

Appellant was indicted upon three separate counts of murder in the first degree.[1] Guilty verdicts of murder in the first degree were returned and appellant received a sentence of life imprisonment.[2]

The victims of these homicides were an elderly couple, Walter and Mildred Feagley, who at the time of their deaths owned and operated a bakery which was located some eight miles from the city of Anchorage. Appellant was an employee of the Feagleys and resided within walking distance of the bakery. Living with appellant was Howard Mosquito, another employee of the bakery. Also sharing appellant's residence were appellant's mistress, Lois Harris, and Julia Barr who was the mistress of Howard Mosquito.

In the early morning hours of June 21, 1967, appellant was requested to come to the headquarters of the Alaska State Troopers in Anchorage. At this point in time the police had just begun their investigation into the shootings and had obtained information that two employees of the bakery, appellant and Mosquito, had been seen in the vicinity of the bakery shortly after the deaths of the Feagleys had been discovered. While appellant was at headquarters, two Alaska state troopers went to his residence and obtained a .32 caliber revolver, four shells, a partial box of shells, an overcoat, and a set of keys.

At the hearing which was held in regard to appellant's motion to suppress, a factual dispute developed as to whether appellant had consented to the search, as well as to the extent that either Howard Mosquito or Lois Harris had voluntarily produced these items for the officers who had gone to the residence of appellant.

Appellant denied giving consent to any search and generally denied the substance of Trooper Dankworth's testimony. This officer testified that at the time he spoke to appellant at police headquarters appellant was not under arrest, and that the posture of the police investigation was still general in character. Trooper Dankworth further testified that he advised appellant he had the right to remain silent, that he had the right to the presence of counsel, and that if he could not afford

---

1. In Counts I and II, appellant was charged with the premeditated murder of Mildred and Walter Feagley. In the third count of the indictment, appellant was charged with the felony murder of Walter Feagley. The jury returned a not guilty verdict as to this third count.

2. Appellant was sentenced to life imprisonment on Count I and 15 years on Count II which was made to run consecutively to the life sentence.

counsel, then counsel would be furnished him prior to any questioning.[3] According to Dankworth's evidence, after this warning had been given, appellant was still willing to talk to him. Dankworth then asked appellant

> if he owned a weapon and he told me that he did; that he had purchased one in Chicago. I asked him at that time, where the weapon was and he said it was at his home. I spent some time at that time explaining what ballistics were and that the police naturally would like to take the weapons of the employees of this establishment and test them, and asked him if he had any objections for our testing his weapon to determine if it had been fired. At this point, the defendant told me, '* * * Well, you'll find that it has been fired,' And, I said, 'When was that'?, and he said that the— the day prior, he and Mosquito had been out target practicing. I spent some time explaining that that wouldn't effect the ballistic tests that I had in mind and asked if he had any objection to our using this weapon and sending it to the FBI and he told me that he had not done anything and had no reason to object to my taking the weapon and that I could have the weapon. At that point, I asked him if I could send a trooper out to his place and pick up the gun, which he agree to. And, I dispatched a trooper out.

According to Trooper Dankworth, during the time this conversation took place appellant was neither the prime suspect nor even a suspect, and that the police did not know the size of the bullets which had killed the Feagleys since no autopsy had as yet been performed.

As a result of Trooper Dankworth's conversation with appellant, Troopers Church and Ulfers were dispatched to pick up appellant's revolver. Trooper Church testified that when they drove up to the appellant's residence in their squad car both Howard Mosquito and Lois Harris came out on the front porch, that Howard Mosquito recognized him and shook his hand, and that he then identified himself as an investigator with the Alaska State Troopers and also introduced investigator Ulfers. According to Church,

> at this time, we didn't even ask about the gun; Howard Mosquito said, 'The gun's inside.', and we all went in. Howard Mosquito pointed toward an open closet, which is this one big front room in there, and Lois Harris went over and handed me the overcoat, which the gun was in.
>
> * * * * * *
>
> * * * [T]he gun was bulging out in the pocket and I took the gun out of the pocket * * *.
>
> * * * * * *
>
> * * * [A]t that time, Lois Harris handed me several other items; a box of .32 caliber shells—a partial box, and an American Express Money Order. I think she reached in the pocket as far as I can recall, reached in the pocket of the coat and brought four empty shells out and a set of keys, and handed those to me too.

Trooper Church gave further testimony that no search was conducted of appellant's residence at this time. Trooper Church testified that Harris and Mosquito agreed to come to headquarters. After Trooper Church had returned to headquarters, Trooper Dankworth showed the weapon to appellant. According to Dankworth,

> [h]e identified it as his weapon and I went on and explained further that it may require that I keep this gun for some time as I needed his permission to keep it for some time as it needed to be sent back to the FBI again. This he agreed to.[4]

---

3. *Compare* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). Trooper Dankworth also testified that no threats or promises were made to appellant.

4. Trooper Dankworth additionally testified that appellant did not register any surprise when shown the weapon and that after being shown the weapon, appellant went home.

Howard Mosquito's and Lois Harris' versions of what transpired are in harmony with the testimony of Trooper Church at many significant points. Such conflicts as do appear in the record concern what transpired immediately upon the officers' arrival at appellant's residence. Howard Mosquito testified that the officers asked if they could search the place and he then let them in. Lois Harris' version was that the officers stated they wanted to see appellant's clothing.

At the conclusion of the suppression hearing, the trial judge denied appellant's motion to suppress. In articulating the reasons for his ruling, the trial judge stated in part:

> I'm of the opinion in this case that Mr. Sleziak did give permission to get the gun. In that respect, I find that Mr. Sleziak's testimony is not credible and that the officers' testimony is credible. I find that there was neither a search nor a seizure under the circumstances existing, and that whatever the officers did was certainly not unreasonable under the circumstances. * * * Taking the whole thing together and having watched and listened to the witnesses that testified * * * I'm of the opinion that * * * there [was] neither any search nor any seizure; that the officers had specific permission to do what they did, and that, in any event, whatever they did wasn't unreasonable.

We affirm the superior court's denial of appellant's motion to suppress.

Both the fourth amendment to the federal constitution and its counterpart found in article I, section 14 of the Alaska constitution furnish guarantees against unreasonable searches and seizures.[5] Granted a warrantless search and seizure indicates unreasonableness in the constitutional sense, we have heretofore recognized certain exceptions to the necessity of procuring a warrant as a prerequisite to a lawful search and seizure. In Goss v. State[6] we held that a warrantless search incident to and contemporaneous with a lawful arrest was an exception to the rule that a search must rest upon a search warrant. In the more recent case of Stevens v. State[7] this court, in sustaining the search and seizure therein questioned, adopted the "exigency rule" exception to the necessity for a search warrant. It is also well established by both federal and state precedent that, "When an accused consents to a search or seizure conducted without a search warrant, the protection he would have enjoyed under the Fourth Amendment is lost to him."[8] In the case at bar we are concerned with this latter exception.

The guiding criterion in resolving search and seizure issues is one of reasonableness in the constitutional sense.[9] Concerning the problem of determining reasonableness, we said:

> There seems to be no exact formula for the determination of reasonableness in connection with a search and seizure and so each case must be decided on its own facts and circumstances.[10]

---

5. Art. I, § 14 of the constitution of Alaska provides:
   > The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6. 390 P.2d 220, 223 (Alaska 1964), cert. denied, 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964). *Goss* was followed

in Merrill v. State, 423 P.2d 686 (Alaska 1967).

7. 443 P.2d 600 (Alaska 1968).

8. United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963).

9. Goss v. State, 390 P.2d 220, 223 (Alaska 1964), cert. denied, 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964).

10. Ellison v. State, 383 P.2d 716, 719 (Alaska 1963). In Weltz v. State, 431

In light of these general principles, we have concluded that the trial court's ruling on appellant's motion to suppress is sustainable on several independent grounds. First, we are of the opinion that the element of unreasonableness is absent here. Our study of the entire record has brought us to the conclusion that no unreasonable search or seizure in fact occurred. Additionally, we are of the opinion that appellant's consent removed the necessity for the obtaining of a search warrant in the case at bar.

Turning first to the question of appellant's consent, the second circuit's opinion in United States v. Smith [11] affords an appropriate basis for initial analysis of the consent issue as raised in the case at bar. In the *Smith* case, the court said in part:

> [A]n accused's voluntary consent must be proven by clear and positive evidence. A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit. Moreover, to be voluntary, a consent must have been unequivocal, specific, and intelligently given. Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651 (1951) * * *

> But the case-by-case application of these principles is not always easy. The line between an accused's voluntary consent and his involuntary submission to police authority is often difficult to draw. Though all the cases involving the le-

gality of warrantless searches and seizures are not fully reconcilable, some guidelines are discernible. When a law enforcement officer knocks at the door, identifies himself, and asks to be allowed to search the premises, the acquiescence thus obtained is generally not considered to be voluntary consent. See Judd v. United States * * *.

On the other hand, if the defendant permits a warrantless search of his home or establishment in the mistaken belief that he has nothing there which will incriminate him, it has been held that the search has been voluntarily consented to. [12]

In contending that the facts of this case do not permit a finding of voluntary consent, appellant relies upon the decisions of Judd v. United States [13] and Channel v. United States. [14] In distinguishing these authorities, the court in Gorman v. United States [15] said:

> In *Judd,* the suspect was arrested as he entered a friend's room, was taken to jail, interrogated for several hours, and then at 2:00 a. m. taken, handcuffed, to his apartment in the custody of four officers, where a search was made. In *Channel,* the suspect was arrested in a parking lot, questioned at an FBI office for 30 to 45 minutes, at the end of which time officers left to make a search of suspect's apartment. In both cases the de-

P.2d 502, 505 (Alaska 1967), we also said that resolution of conflicting testimony and issues of credibility arising in suppression hearings is within the province of the trial judge and that his decision thereon will not be disturbed if a record discloses rational basis for his conclusion.

11. 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963).

12. *See also* Gorman v. United States, 380 F.2d 158, 163 (1st Cir. 1967), where the court stated that consent
   must be 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion * * *.' Simmons v. Bomar, 349 F.2d 365, 366 (6th Cir. 1965). And, since arrest carries its

own aura of coercion, the burden of the government to show voluntary consent is 'particularly heavy'. Judd v. United States * * * Villano v. United States, 310 F.2d 680 (10th Cir. 1962). Nevertheless, each case stands on its own facts and the heavy burden may be carried. United States v. Mitchell, 322 U.S. 65, 64 . S.Ct. 896, 88 L.Ed. 1140 (1944). See generally Annot., Validity of Consent to Search Given by One in Custody of Officers, 9 A.L.R. 3d 858 (1966).

13. 89 U.S.App.D.C. 64, 190 F.2d 649 (1951).

14. 285 F.2d 217 (9th Cir. 1960).

15. 380 F.2d 158, 163–164 (1st Cir. 1967).

fendants, asked whether they had certain items at home, said they did not and declared that the police could go look and see that they did not. In each case the court held that the declaration could not be interpreted as consent to a search without a warrant. *That may be so, but when the accused is directly asked whether he objects to the search, there must be at least some suggestion that his objection is significant or that the search waits upon his consent. When this is combined with a warning of his right to be silent, and his right to counsel, which would seem in the circumstances to put him on notice that he can refuse to cooperate, we think it fair to infer that his purported consent is in fact voluntary. There is no suggestion in the record that the police or the FBI agents pressured Gorman to give his consent, made any threats or promises, or considered the motel room as anything except a loose end which good police procedure required to be tied up.* (emphasis added)

▪ We choose to adopt the reasoning of the *Gorman* court and hold that appellant's consent validated any search or seizure which took place in regard to the prosecution's obtaining possession of appellant's .32 caliber revolver. In the case at bar prior to any mention of the .32 caliber revolver, appellant, who was not under arrest and was not a suspect, had been advised he had the right to remain silent and that he had the right to the presence of counsel, either retained or court-appointed, prior to any questioning. After appellant had indicated his willingness to talk in response to a question, he admitted ownership of a weapon. After this admission, Trooper Dankworth explained the subject of ballistics to appellant and asked appellant if

he had any objections to the testing of his weapon by the police. Appellant indicated that he had no objection. Subsequently, appellant was again asked if he had any objection to the police using his weapon and sending it to the FBI. Once again appellant answered that he had no objection. Appellant was then asked by Trooper Dankworth if he could send a trooper to appellant's residence to pick up the gun. Again appellant had no objection. Finally when the troopers returned to headquarters with the weapon, appellant identified it as his and again gave Trooper Dankworth permission to retain possession of it so that it could be sent to the FBI. On these facts we hold that the prosecution met its burden of establishing a voluntary, unequivocal, and intelligent consent by clear and positive evidence.[16] Absent are any indications that the police resorted to duress or coercion in order to obtain appellant's consent. In the factual context in which appellant gave his consent, it is not unreasonable to conclude that he was put on notice that he could refuse to cooperate with the law enforcement authorities.

▪ One additional aspect concerning appellant's consent remains for consideration. Appellant argues that a necessary prerequisite to appellant's valid consent was a warning as to his right under the fourth amendment.[17] On the record in the case at bar we hold that a specific warning of appellant's rights under the fourth amendment or article I, section 14 of the Alaska constitution was not a necessary prerequisite. In reaching this result we adopt the reasoning of Gorman v. United States [18] where the court said:

We cannot accept the recently suggested rule that a specific warning of fourth amendment rights is necessary to

16. *Compare* United States v. Gorman, 355 F.2d 151, 159 (2d Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966); Frye v. United States, 315 F.2d 491 (9th Cir. 1963), cert. denied, 375 U.S. 849, 84 S.Ct. 104, 11 L.Ed.2d 76 (1963); McDonald v.

United States, 307 F.2d 272, 274–275 (10th Cir. 1962).

17. *See,* Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Col.L.Rev. 130 (1967); Effective Consent to Search and Seizure, 113 U.Pa.L.Rev. 260 (1964).

18. 380 F.2d 158, 164 (1st Cir. 1967).

validate a warrantless search after the suspect has been arrested. United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966) * * *. Although the analogy with Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has a surface plausibility, we do not think that the Miranda prescription, formulated to give threshold warnings of fifth and sixth amendment rights at the earliest critical time in a criminal proceeding, must or ought to be mechanistically duplicated when circumstances indicate the advisability of requesting a search. In the first place, advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda*. Their purpose was not to add a perfunctory ritual to police procedures but to be a set of procedural safeguards 'to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it.' 384 U.S. at 444, 86 S.Ct. at 1612. These constitute 'an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere.' Id. at 468, 86 S.Ct. at 1624. The obligation of the interrogators is not discharged by the adequate and effective appraisal of the accused's rights. 'If * * * he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.' Id. at 444–445, 86 S.Ct. at 1612. While the police interrogators must faithfully carry out *Miranda's* mandate at the threshold, they may then proceed to elicit responses, however, incriminating, without further specific warning. To single out for further warning a request to search premises of an accused is to assume that a different order of risks has not been covered at the threshold. But that things which might be found in a search could be used against an accused seems implicit in the warning of the right to remain silent which, as the Court observed, is calculated to make him 'more acutely aware * * * that he is not in the presence of persons acting solely in his interest.' 384 U.S. at 469, 86 S.Ct. at 1625.

■ In adopting this reasoning, we hold that it was not necessary to advise appellant of his fourth amendment rights after appellant had been advised of his right to remain silent and of his right to the presence of either retained or appointed counsel prior to any questioning.

Our research has disclosed no state court decisions which have held that a *Miranda*-type warning as to fourth amendment rights is a necessary precondition to validation of a consent.[19] Study of the applicable federal decisions reveals some diversity of opinion.[20] When presented

19. State v. Frisby, 245 A.2d 786, 788 (Super.Ct.Del.1968) ; State v. Oldham, 92 Idaho 124, 438 P.2d 275, 282 (1968) ; State v. McCarty, 199 Kan. 116, 427 P.2d 616, 616–620 (1967) ; State v. Forney, 181 Neb. 757, 150 N.W.2d 915 (1967) ; State v. McKnight, 52 N.J. 35, 243 A.2d 240, 250 (1968) ; State v. Leavitt, R.I., 237 A.2d 309, 319–320 (1968).

In State v. McKnight, 52 N.J. 35, 243 A.2d 240, 250 n. 4 (1968), the court said in part:

We note, without exploring the subject, that although the cases are already in disagreement, there is no rush to find that a consent to a search, if not coerced, will fall if the consent is obtained without warnings as to the Fourth Amendment rights. Again the values involved are different. The probative value of what is seized is not tainted by any risk of 'coercion.' Further, the rule of exclusion, devised to deter insolvence in office, is of questionable relevancy when the officer requests and receives permission to search.

20. In addition to the First Circuit's opinion in Gorman v. United States, 380 F. 2d 158 (1st Cir. 1967), see Rosenthal v. Henderson, 389 F.2d 514 (6th Cir. 1968). *Contra* is United States v. Nikrasch, 367 F.2d 740, 744 (7th Cir. 1966), where the court said in part:

Since the arrested defendant was then in custody in the Skokie cell-block and had not been apprised of his Fourth Amendment rights, the trial court correctly observed that no true consent had been given to Detective Reiter. Two years later in Byrd v. Lane, 398

with a factual situation in which no warnings of fifth or sixth amendment rights have been given prior to the obtaining of consent, we will re-examine the question of whether advisement of fourth amendment rights is a necessary prerequisite to a valid consent to search.

As we indicated earlier, we believe that the .32 caliber revolver and the other items of evidence in dispute were admissible because they were not obtained as the result of an unreasonable search and seizure. We reach this conclusion upon consideration of several factors. In Brown v. State[21] we defined the term "search" in the following manner:

A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a 'search'.

■ In the *Brown* case, "seizure" was defined in the following manner: "A seizure contemplates a forcible dispossession of the owner and is not a voluntary surrender." Accepting Trooper Church's account of what transpired when he arrived at appellant's residence, we are of the view that none of the items in question were obtained by virtue of a search or seizure.[22] When appellant's coat was handed to Trooper Church, a portion of the .32 caliber revolver was protruding from one of its pockets. As to the other items, the trial court could have reasonably concluded that Lois Harris did in fact, without prior request, voluntarily turn them over to Trooper Church. The foregoing furnishes the basis for our conclusions that no search or seizure was carried out by the troopers at the time in question, and that this record does not demonstrate any unreasonable conduct on the trooper's part.[23] We therefore hold that the trial court correctly denied appellant's motion to dismiss.[24]

Appellant's next point is that the trial court improperly admitted certain color photographs which were taken of the two victims at the time of the autopsy. Appellant argues that these photographs were unnecessary and that any evidentiary value they possessed was outweighed by their

F.2d 750, 755 (7th Cir. 1968), the prosecution asked the court to re-examine and revaluate its holding in *Nikrasch*. After noting the *Gorman* case, the court said:
    While we think our statement in *Nikrasch* of dubious propriety, we are not disposed to reject it because it was given application to a factual situation at great variance with that here.
*See also* United States v. Moderacki, 280 F.Supp. 633 (D.C.Del.1968); United States v. Blalock, 255 F.Supp. 268 (E.D. Pa.1966).

21. ⁿ72 P.2d 785, 790 (Alaska 1962).

22. As previously indicated, resolution of conflicts in the suppression hearing testimony is left to the trial judge. Weltz v. State, 431 P.2d 502, 505 (Alaska 1967). Also previously mentioned was the fact of substantial agreement in the testimony of Howard Mosquito and Lois Harris with that of Trooper Church.

23. In addition to appellant's prior consent to obtain the weapon from his premises, also present is the fact that Howard Mosquito invited the troopers into the house. At the time in question appellant was sharing these quarters with Howard Mosquito, as well as Lois Harris (Mosquito paying half of the rent). Here, according to the troopers' testimony, the co-occupants of appellant's quarters, without solicitation by the police, secured the evidence themselves and turned it over to the police.

24. Appellant also contends that even if there was consent to search the evidence should have been suppressed because no search warrant was obtained, citing Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948). In United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), it was held that the relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. *See also* Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730, 734 (1967), and Ellison v. State, 383 P.2d 716, 719 (Alaska 1963), where the *Rabinowitz* decision was followed.

inflammatory effect on the jury. In Stevens v. State [25] we said:

> This court has held that a photograph is admissible in evidence in the discretion of the trial judge, as an aid to the court or jury, after it has been shown to be a faithful representation of whatever it purports to depict, provided it is relevant, and provided its evidentiary value is not outweighed by any prejudice it might create.[26]

■ We cannot find that as a matter of law the trial court abused its discretion in admitting these photographs. Our study of the record has convinced us that there is nothing unusually gruesome, or repulsive, or horrifying about these photographs which would outweigh their evidentiary value. In the case at bar, the prosecution's case was entirely circumstantial and a reading of the record reveals that the photographs in question portrayed the conditions described by certain of the state's witnesses, including that of Dr. Beirne.[27]

Appellant has also advanced the contention that the trial court committed reversible error in his motion to dismiss the indictment on the grounds that insufficient evidence was produced to warrant the returns of the indictment. In State v. Parks [28] it was said in part:

> We intimated in [State v. Shelton, 368 P.2d 817 (Alaska 1962)] that we would hold an indictment to be insufficient and subject to dismissal if it appeared that no evidence was presented to the grand jury that rationally established the facts.
>
> Under such a rule, the question is one of sufficiency of the evidence—whether it is adequate to persuade reasonable minded persons that if unexplained or uncontradicted it would warrant a conviction of the person charged with an offense by the judge or jury trying the offense.[29] Sufficiency of the evidence is the test prescribed by statute.[30]

■ Also relevant to our decision in regard to this issue is State v. Shelton.[31] There, in passing upon a similar contention, we said: "There is a presumption that it [the grand jury] acted on sufficient evidence, and [the defendant] * * * has not sustained his burden of showing that it did not." [32] In the case at bar we have concluded that appellant has not overcome the presumption we recognized in *Shelton*. The record shows that two witnesses tes-

---

25. 443 P.2d 600, 603 (Alaska 1968) (footnote omitted).

26. Cited in support of the text were our prior decisions in Maze v. State, 425 P.2d 235, 239 (Alaska 1967), and McIntyre v. State, 379 P.2d 615, 617, 8 A.L.R.3d 1231 (Alaska 1963). *See also* Watson v. State, 387 P.2d 289, 294 (Alaska 1963).

27. In admitting these photographs, the court stated in part:
    All right, the objection will be noted. The objection will be overruled right down the line. I'm satisfied in my own mind that these pictures have probative value and that the probative value overweighs any possible prejudice that may be created.
    The state contends that these photographs of the bullet wounds were relevant as to three specific issues in the case, namely, "absence of suicide, self-defense and the degree of murder."

28. 437 P.2d 642, 644 (Alaska 1968) (footnotes omitted).

29. Crim.R. 6(k) provides in part:
    The grand jury ought to find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction by the trier of the offense.

30. AS 12.40.050 provides:
    The grand jury may indict or present a person for a crime upon sufficient evidence, whether that person has been held to answer for the crime or not.

31. 368 P.2d 817, 819 (Alaska 1962).

32. *Shelton* was thereafter followed in Merrill v. State, 423 P.2d 686, 695 (Alaska 1967).

tified before the grand jury, namely, Trooper Church and Mrs. Anna Smith. Our study of the transcript of the trial testimony of these two witnesses furnishes support for the trial court's ruling on the sufficiency of evidence question. Mrs. Smith testified that she observed appellant walking rapidly toward the bakery at approximately 7 p.m. Trooper Church testified that appellant on two occasions denied having gone to work at the bakery that evening. Trooper Church had also obtained statements from Lois Harris and Howard Mosquito that appellant left his residence at 7 p.m., and did not return until 8:30 p.m., and that when he left he had told Lois Harris he was leaving for work. Trooper Church also had knowledge that shortly after the killings, appellant had possession of Walter Feagley's only set of keys to the bakery and to his automobile. Trooper Church testified that appellant had told him Mr. Feagley had given him the keys two days prior to the killings so that appellant could have easy access to the bakery. Trooper Church also gave evidence as to the discovery of Walter Feagley's .357 magnum revolver which was concealed near appellant's residence. When discovered, the weapon had a light rust surface on it indicating it had been exposed to the elements for only a few days. The victim's magnum contained four empty shells. Trooper Church also knew from his investigation of the scene of the crime and from his presence at the autopsy that the person who committed the murder had fired two large caliber bullets at Mr. Feagley, one of which killed him. Trooper Church also indicated that he could have testified to the similarity of the bullets which were removed from Mr. Feagley's body to those procured by appellant for his own .32 caliber revolver. From the statements that Trooper Church had obtained from Howard Mosquito and Lois Harris, the grand jury could have been informed that appellant was acting strangely when he left for work at 7 a.m., and that when he returned at 8:30 p.m. he seemed upset. Also Trooper Church had information that when appellant returned from his 10 p.m. trip to the bakery, he anxiously unloaded his .32 caliber revolver and told Lois Harris he had nothing to do with it.

The judgment and commitment entered below is affirmed.