[No. 433-1.    Division One—Panel 1.    February 8, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES EDWARD CASHAW, *Appellant.*

*Lowell K. Halverson,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Douglas S. Dunham, Deputy,* for respondent.

HOROWITZ, C.J.—Defendant, after trial by jury, was convicted of violating RCW 9.79.060(5). That statute provides that "Every person who— ·.· . . (5) [s]hall live with

or accept any earnings of a common prostitute, . . . [s]hall be punished . . ."

Motion for a new trial was denied and judgment and sentence were entered. Defendant appeals, newly-appointed counsel having been appointed for him on appeal.

On November 7, 1969, defendant was arrested by Detectives Bartley, Patrick and Richards for suspicion of living with and accepting the earnings of a common prostitute. He was at that time advised of his Miranda rights, and, prior to being taken to the station, admitted he had been living with Linda, the alleged prostitute, and that he knew she was a prostitute. The next morning defendant was again advised of his rights but refused to sign a form waiving them. Nevertheless, he was questioned and admitted more facts showing his involvement with Linda and again admitted living with her and that they were not married. When he was accused of taking earnings from her, he expressed his desire to end the interview which, according to his wishes, was then terminated.

Defendant concedes there is sufficient evidence to support the charge but contends first that answers given by defendant during custodial interrogation were illegally admitted at trial, and secondly, that RCW 9.79.060(5) is unconstitutional.

The trial court, after a CrR 101.20W pretrial hearing, held the testimony as to defendant's answers admissible. Substantially the same testimony given by the arresting and interrogating officers, including the officers not testifying at the pretrial hearing, was subsequently admitted at trial. The court held and its CrR 101.20W findings show that it accepted the testimony of the Seattle detectives[1] concern-

---

[1]At a pretrial hearing, Detective Patrick testified to defendant's answers given on November 7, 1969. They included the following:

Q  After these rights were given to Mr. Cashaw did he indicate his willingness to discuss this arrest with you?

A  Yes. We asked him if he understood his rights. He replied that he did understand his rights.

Q  What else happened after that?

. . .

I then asked him, "You must know that Linda is a prostitute."

ing the answers given on each of the two occasions as substantially accurate. It found that on each of the two occasions that defendant was advised of his constitutional rights before answering the questions put to him; that he indicated that he understood his rights; and that the defendant's answers were freely and voluntarily given without duress, promise or threat and with full understanding of his constitutional rights. The court also found that defendant was not requested to sign a written waiver on the first occasion

---

He replied that he did but that was her business.

Then I asked him if they had lived together around nine months. He said yes but that they were arguing all the time.

We then transported him to our office where he was screened through the sergeant and booked in the city jail.

Detective Patrick also testified to the second set of answers given on November 8, 1969. They included the following:

Q  Was he willing to talk to you about this matter?

A  To a point, yes.

Q  All right. And what did he say?

A  Well, he stated that he had felt that we were being pushed—rather we [sic] forced by [Linda] to press charges against him, that he was always being harrassed [sic] by the police.

. . .

[He then stated where he had been working and where Linda had been working and what his earnings were.]

I asked if he supported Linda. He said, "I buy certain food items, I mean, food, lodging and clothing, and so forth."

They lived like any other man and wife and they planned to get married.

I asked him how much the rent was on the apartment.

He stated $115 per month. I then asked him about saying in the police car he knew that Linda was a prostitute and accused him for taking her earnings from her.

At that time he confessed his desire to end the interview, which we did.

Q  All right. With regard to the second interview, Detective Patrick, were any threats made to Mr. Cashaw in regard to inducing him to make any statements to you?

A  No.

Q  Were any promises made? Any duress of any nature?

A  No.

Q  To the best of your knowledge were these statements freely and voluntarily given?

A  Yes.

Detective Birkeland's testimony supported that of Detective Patrick. Defendant denied much of the foregoing testimony.

and that he refused to sign a written waiver on the second occasion. It concluded that defendant's statements could be used as evidence against the defendant.

Defendant contends that the officers' testimony was inadmissible because under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), when a person is taken into custody and warned of his rights:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

(Footnote omitted.) *Miranda*, 384 U.S. at 473-74.

■ In determining whether any part of the Miranda rule has been complied with, we must look to the trial court's findings to determine what occurred. In a CrR 101.20W hearing, the question of whether waiver occurred is a question of fact resolvable on an *ad hoc* basis upon the whole record before the court. When the testimony of the witnesses differs, as in the case here, the credibility is a matter for the trial court's determination. The court in so passing on the credibility of a witness, be he the accused or a police officer, applies no different standards than he does in the case of any other witness. The risk that an accused may not be believed and as a result may be unable to claim Miranda rights in a CrR 101.20W pretrial hearing is an unavoidable risk of the fact-finding process committed to a trial court. No legislation requires that a trial court accept the testimony of a witness regardless of whether such testimony is believed. Accordingly, whether a defendant waives his constitutional rights must be determined on the basis of testimony accepted as correct by the trial court. *State v. Haverty*, 3 Wn. App. 495, 475 P.2d 887 (1970); *State v. Davis*, 73 Wn.2d 271, 283, 438 P.2d 185 (1968).

■■ The trial court, from the testimony it accepts as true, must determine initially whether the mere refusal to

sign a waiver of rights form is under the circumstances testified to the same as the refusal to answer questions. One may express a willingness to answer questions orally and at the same time refuse to sign a written waiver form. *State v. Hill,* 76 Wn.2d 557, 458 P.2d 171 (1969); *State v. Auger,* 434 S.W.2d 1 (Mo. 1968); *Auger v. Swenson,* 302 F. Supp. 1131, 1137 (W.D. Mo. 1969); *Hodge v. United States,* 392 F.2d 552 (5th Cir. 1968). Accordingly, the mere refusal to sign a written waiver form is but one circumstance to be considered on the issue of waiver in fact. *Auger v. Swenson, supra; cf. People v. Fioritto,* 68 Cal. 2d 714, 441 P.2d 625, 68 Cal. Rptr. 817 (1968). If the accused in addition to refusing to sign a written waiver of rights form refuses to be interrogated further and the officer continues with the interrogation refusing to take "no" for an answer, a different question is presented. *See State v. Adams,* 76 Wn.2d 650, 673, 458 P.2d 558 (1969); *cf. People v. Brockman,* 2 Cal. App. 3d 1002, 82 Cal. Rptr. 70 (1969). If however, under the totality of circumstances involved, the answers of the accused are given voluntarily, knowingly, and intelligently, following Miranda warnings or following a refusal to sign a written waiver form read by the accused, then the answers are admissible under the rationale of cases such as *State v. Hill, supra. See also, People v. Jarvis,* 276 Cal. App. 2d 446, 80 Cal. Rptr. 832, 836 (1969).

█ *Miranda* does not require that a waiver of Miranda rights be in writing. It requires only that the waiver be made "voluntarily, knowingly, and intelligently." *Miranda* at 384 U.S. 444; *Klingler v. United States,* 409 F.2d 299, 308 (8th Cir. 1969). The meaning of the words "voluntarily", "knowingly", and "intelligently" overlap. Their common thrust, however, is directed to the existence of free choice on the part of the accused, that is, a waiver with knowledge of Miranda rights without compulsion and by one mentally and physically capable of exercising such choice. Thus the term "voluntarily" is used in the due process sense to assure the absence of physical or psychological compulsion. *Miranda* recognized the possible "inherently compelling pres-

sures" of custodial interrogation and concluded that an additional mandatory safeguard was necessary to help eliminate such compelling pressures. Hence the use of the word "knowingly" was intended to make clear the necessity for express Miranda warnings in every case of custodial interrogation as a condition precedent to the admissibility of answers obtained from such interrogation. More, however, was required. The court recognized that an accused might not by reason of physical or mental impairment understand the warnings. The word "intelligently" made it clear that such capacity to understand was a prerequisite to the existence of waiver. The word "intelligently", however, does not mean that the accused must be aware of the incriminating nature of the answers he gives in the course of custodial interrogation; nor is it required that the accused be aware of the law relating to the crime, possible defenses, and the precise nature of the risks of talking without the aid of counsel. *State v. Aiken*, 72 Wn.2d 306, 434 P.2d 10 (1967). As stated in *State v. McKnight*, 52 N.J. 35, 55, 243 A.2d 240, 251-52 (1968):

> Hence if a defendant was given the *Miranda* warnings, if the coercion of custodial interrogation was thus dissipated, his "waiver" was no less "voluntary" and "knowing" and "intelligent" because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. A man need not have the understanding of a lawyer to waive one. Such matters, irrelevant when the defendant volunteers his confession to a friend or to a policeman passing on his beat, are equally irrelevant when the confession is made in custody after the coercion of custodial interrogation has been dispelled by the *Miranda* warnings. With such warnings, the essential fact remains that defendant understood he had the right to remain silent and thereby to avoid the risk of self-incrimination. That is what the Fifth Amendment privilege is about.

In the instant case, the court's findings, including the one on voluntariness, are supported by substantial evi-

dence. On each of the two occasions detectives first warned the defendant of his Miranda rights and on each of such occasions, after he was so warned, the defendant stated he understood those rights. Defendant had been interviewed by police officers before. In his second conversation he refused to sign the written waiver form after reading it. His refusal indicated an awareness of his rights. Furthermore, his refusal to continue with the second interrogation when the question was raised concerning his acceptance of Linda's earnings while knowing her to be a prostitute, confirms the fact that he understood his rights. *State v. Adams,* 76 Wn.2d 650, 671, 458 P.2d 558 (1969); *United States v. Hayes,* 385 F.2d 375 (4th Cir. 1967), *cert. denied,* 390 U.S. 1006, 20 L. Ed. 2d 106, 88 S. Ct. 1250 (1968); *People v. Brockman, supra; see Taylor v. Warden, Maryland Penitentiary,* 307 F. Supp. 1192 (D. Md. 1969). The officers' testimony accepted by the court showed that the defendant's conduct was coherent and rational—no promises or threats were made. There is no evidence of any trickery, cajolery, menace, or intimidating procedures, physical or psychological. The interrogation was relatively short. The evidence shows, especially by his refusal to sign the waiver form and his willingness to answer questions selectively, that he understood the nature and quality of his acts. There is no claim that he was mentally impaired or incapable of making a free choice of the alternatives contained in the Miranda warnings. The fact that he may not have understood the incriminatory thrust of his answers, especially on the first interrogation, does not mean that he did not, as above pointed out, act "voluntarily, knowingly, and intelligently." *State v. Aiken, supra; State v. McKnight, supra.*

■ The court, it is true, made no express finding that defendant had waived his constitutional rights. However, the court's oral opinion expressly states that he did so. It is unnecessary for the defendant to state expressly that he waived his constitutional rights because waiver may be implied from the circumstances. *State v. Haverty,* 3 Wn. App. 495, 475 P.2d 887 (1970). The resolution of the issue de-

pends upon the facts and circumstances of the case including the background, experience, and conduct of the accused. *People v. Brockman, supra; United States v. Hayes, supra.* Accordingly, the court had the right to infer the existence of waiver from its finding that the defendant's answers were freely and voluntarily made without duress, promise or threat and with full understanding of his constitutional rights. *State v. Haverty, supra; State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968); *United States v. Hayes, supra.* We find no error in the admission of the defendant's answers. It is therefore unnecessary to consider the state's further contention that if the answers given on the occasion of the first interrogation were properly admitted, and, if the answers given on the occasion of the second interrogation were not, that any such error was harmless because the second set of answers was at best in substance merely repetitive of the first. *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *State v. Slack,* 3 Wn. App. 116, 472 P.2d 541 (1970); *People v. Brown,* 4 Cal. App. 3d 382, 84 Cal. Rptr. 390 (1970); *United States v. Sanchez,* 422 F.2d 1198 (2d Cir. 1970); *United States v. Smith,* 418 F.2d 223 (6th Cir. 1969).

Defendant next contends that RCW 9.79.060(5) is void as violative of the due process clause of the fourteenth amendment to the United States Constitution. He claims that the statute is impermissibly vague and thus "fails to give adequate warning of the boundary between the constitutionally permissible and the constitutionally impermissible applications of the statute." *Wright v. Georgia,* 373 U.S. 284, 292, 10 L. Ed. 2d 349, 83 S. Ct. 1240 (1963). He further claims that the statute is overbroad, thus subjecting innocent conduct to criminal sanction. We disagree with the contentions of the defendant. It is settled that the constitutionality of a statute is to be determined on the basis of the meaning given it by judicial decisions. *See In re Elliott,* 74 Wn.2d 600, 446 P.2d 347 (1968).

Defendant suggests several illustrations of vagueness and overbreadth. He suggests that the phrase "accept

any earnings" contained in the statute would encompass the acceptance of earnings of a prostitute gained from lawful activities. However, the phrase "earnings of a common prostitute" has been construed as meaning only earnings gained by prostitution. *State v. Crane,* 88 Wash. 210, 152 P. 989 (1915). Defendant also suggests that the statutory phrase "live with" is unclear and unconstitutionally broad. He suggests the case of a husband or a female roommate of a prostitute who is unaware of the prostitute's activities, or alternatively, who is aware of the activities but does not encourage them. The statute, however, is not as unclear as claimed. The meaning of the term "live with" as used in the statute includes that of cohabitation, even for 1 day, with the intention of continuing the relationship together. *State v. Thuna,* 59 Wash. 689, 109 P. 331, 111 P. 768 (1910). The state, it is true, need not prove that the defendant had knowledge of the woman's activities as a prostitute; however, lack of such knowledge is an affirmative defense. *State v. Zenner,* 35 Wash. 249, 77 P. 191 (1904); *State v. Akridge,* 3 Wn. App. 96, 98, 472 P.2d 621 (1970); *cf. State v. Strasburg,* 60 Wash. 106, 110 P. 1020 (1910).

However, we find it unnecessary to determine whether RCW 9.79.060(5) would make criminal the conduct described in defendant's illustrations. Defendant falls outside them and is in no position to raise the hypothetical applications he asks us to consider. As stated in *State v. Lundquist,* 60 Wn.2d 397, 401, 374 P.2d 246 (1962):

> A person may not urge the unconstitutionality of an ordinance or statute unless he is harmfully affected by the particular feature of the ordinance or statute alleged to be an unreasonable exercise of the police power.

To the same effect, *see State v. Human Relations Research Foundation,* 64 Wn.2d 262, 391 P.2d 513 (1964); *United States v. Raines,* 362 U.S. 17, 4 L. Ed. 2d 524, 80 S. Ct. 519 (1960). As pointed out in *United States v. Raines,* in speaking of an act of Congress, "the delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases . . ." 362 U.S.

at 22. The law is still developing; but in the absence of compelling countervailing considerations in the public interest —we see none here—it is not unreasonable to hold that one claiming a statute unconstitutional because of overbreadth should not be able to do so unless he is the one whom the law overreaches. *See* Note, *The First Amendment Overbreadth Doctrine,* 83 Harv. L. Rev. 844, 908 (1970); R. Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court,* 71 Yale L.J. 599 (1962); *State v. Bowman,* 57 Wn.2d 266, 356 P.2d 999 (1960); *State v. Lundquist, supra.*

■ Our concern here is whether the statute as applied to the defendant is constitutional. The statute's constitutionality was upheld in *State v. Craig,* 106 Wash. 630, 180 P. 896 (1919), and *State v. Miles,* 121 Wash. 318, 209 P. 518 (1922). Whatever the state's power may be to make criminal the conduct described in the hypothetical illustrations suggested by the defendant, we know of no reason why it is not within the power of the legislature to prohibit such relationships between unmarried people. We have no reason to conclude that *Craig* and *Miles* are no longer good law.

The judgment is affirmed.

UTTER and WILLIAMS, JJ., concur.

Petition for rehearing denied March 9, 1971.

Review denied by Supreme Court May 6, 1971.