IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80963-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DARIO MARTINEZ-CASTRO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Dario Martinez-Castro challenges his conviction for first degree murder, arguing that the trial court erred in admitting his deleted text messages under the independent source doctrine. Illegally obtained evidence can be admitted if discovered through a source independent from the initial illegality. The doctrine requires that the illegally obtained information not affect the magistrate's decision to issue the independent warrant or the state agents' decision to seek the independent warrant. Because sufficient evidence supports the trial court's findings that the illegally obtained deleted text messages uncovered on the 2018 warrant did not affect the magistrate's decision to issue the 2019 warrant and that the messages did not affect the state agent's unchanged motivation in requesting the 2019 warrant, the court properly admitted the messages under the independent source doctrine.

Martinez-Castro also contends he was coerced into giving incriminating statements to law enforcement. Sufficient evidence supports the trial court's findings that law enforcement officers complied with Miranda,[1] and under the totality of the circumstances, his statements were not coerced.

Finally, he contends that during rebuttal argument, the prosecutor committed misconduct. But Martinez-Castro failed to object to the prosecutor's statements during rebuttal argument, and any impropriety caused by those statements could have been neutralized by a curative instruction to the jury.

Therefore, we affirm.

## FACTS

On April 7, 2017, 18-year-old Dario Martinez-Castro attended a party at Marcos Rojas's house. At the party, Martinez-Castro and another attendee, Pedro Ramirez-Perez, engaged in a physical fight. Shortly after, Martinez-Castro left the party.

About 15 minutes later, Martinez-Castro returned to the party, shot Ramirez-Perez multiple times, and fled. Ramirez-Perez died. Multiple witnesses told the responding officers that Martinez-Castro was responsible.

On the morning of April 8, with the assistance of Martinez-Castro's family, Federal Way Police Officer Justin Gregson spoke with Martinez-Castro on the phone and later contacted him in the parking lot of a nearby restaurant. Officer

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Gregson read Martinez-Castro <u>Miranda</u> warnings and then asked, "[D]o you understand each of these rights I have explained to you?" and "Having these rights in mind, do you wish to talk to us now?"[2]  Martinez-Castro responded affirmatively to both questions.  Officer Gregson transported Martinez-Castro to the Federal Way police station.

At the station, Detective Heather Castro and Detective Mathew Novak interviewed Martinez-Castro.  Detective Castro started the interview by stating, "I have some formal stuff that we will go through, and then we'll just sit and talk, okay?"[3]  Detective Castro proceeded by confirming Martinez-Castro's identity, contact information, and advising Martinez-Castro that the interview was being audio and video recorded.  Detective Castro then reread Martinez-Castro his <u>Miranda</u> warnings.  Martinez-Castro verbally acknowledged that he understood his rights and also signed a written waiver.  He again affirmatively agreed to speak with detectives.

During the interview, Martinez-Castro admitted to attending the party but stated that after the "fist fight," he left and went to a friend's house to sleep.  At some point during the interview, Martinez-Castro gave the detectives permission to search his cell phone, but he later invoked his right to stop the search.  The detectives complied.

---

[2] Clerk's Papers (CP) at 697, finding of fact (FF) 4.

[3] Report of Proceedings (RP) (Sept. 17, 2019) at 48.

Throughout the interview, after either a long silence, new information, an intentional escalation or de-escalation of "emotional tenor," or a break in questioning, Detective Castro asked Martinez-Castro, "Is there anything else you would like to add?"[4] Martinez-Castro consistently responded, "No."[5] Detective Castro also used various interview tactics during the interrogation such as hypothetically discussing crimes Martinez-Castro could be charged with and "[a]ppealing to his emotional side" by bringing up his mother.[6] Despite the detectives' tactics, Martinez-Castro denied killing Ramirez-Perez.

After Detective Castro and Detective Novak completed their interrogation, Detective Adam Howell interviewed Martinez-Castro. Shortly after Detective Howell's arrival, Martinez-Castro invoked his right to counsel. All questioning stopped.

A few days later, Detective Castro submitted an affidavit and applied for a warrant to search Martinez-Castro's cell phone. The trial court issued the 2017 search warrant. Detective Michael Coffey executed the search using Cellebrite, a software program designed to retrieve data from encrypted devices. Detective Coffey did not uncover any useful information.

---

[4] CP at 699, FF 20(b); RP (Sept. 17, 2019) at 72.

[5] RP (Sept. 17, 2019) at 74-75.

[6] Id. at 54.

About a year later, Detective Castro overheard other officers in the department discussing an update to the Cellebrite software that potentially could recover "more information" from an encrypted device.[7]

On December 3, 2018, Detective Castro submitted an affidavit and applied for a second warrant to search Martinez-Castro's cell phone. The trial court issued the 2018 search warrant. Detective Thien Do executed the search using the updated version of the Cellebrite software. Detective Do uncovered incriminating text messages on Martinez-Castro's phone that had been deleted. Martinez-Castro filed a CrR 3.6 motion to suppress the incriminating messages.

Before the trial court ruled on the CrR 3.6 motion, the prosecutor realized that Detective Castro's affidavit in support of the 2018 warrant was problematic. As a result, on May 14, 2019, Detective Coffey submitted an affidavit and applied for a third warrant to search Martinez-Castro's cell phone. The trial court issued the 2019 search warrant. Detective Coffey uncovered the same incriminating deleted text messages.

The trial court granted Martinez-Castro's CrR 3.6 motion to invalidate the 2018 search warrant because Detective Castro misrepresented the extent of her personal knowledge and experience with the Cellebrite software. The court concluded that the 2019 search warrant was valid because the independent source doctrine applied and therefore, the incriminating deleted text messages were admissible.

---

[7] RP (Sept. 26, 2019) at 449.

Martinez-Castro also filed a CrR 3.5 motion to suppress various statements he made during the interviews with law enforcement. The court concluded that there were no "threats, coercions, or promises made" and that the officers "did not overbear Martinez-Castro's free will," and therefore, his statements to the officers were admissible.[8]

At trial, during rebuttal argument, the prosecutor recommended that the jurors acknowledge their emotions surrounding the case but ultimately render a decision based only on the evidence presented. Martinez-Castro did not object. The jury found Martinez-Castro guilty of first degree murder.

Martinez-Castro appeals.

ANALYSIS

I. Independent Source Doctrine

Martinez-Castro contends the independent source doctrine does not apply because the State's motivation to obtain the 2019 search warrant necessarily was based on the State's knowledge of the incriminating deleted text messages that were discovered pursuant to the invalid 2018 search warrant.

We review factual findings for substantial evidence and examine whether the evidence is sufficient to convince a rational person of the truth of the finding.[9] We can supplement the trial court's written findings with its oral decision and

---

[8] CP at 700, FF 21(b), conclusion of law II(a).

[9] State v. Hilton, 164 Wn. App. 81, 89, 261 P.3d 683 (2011) (citing State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)).

undisputed evidence from the record.[10]  We treat unchallenged findings as verities on appeal and review conclusions of law de novo.[11]

Evidence obtained from an illegal search and seizure is "subject to suppression under the exclusionary rule" unless an exception to the exclusionary rule applies.[12]  One of the "well-established" exceptions to the exclusionary rule is the independent source doctrine.[13]

> In applying the independent source doctrine, the determinative question is whether the challenged evidence was discovered through a source independent from the initial illegality. To determine whether challenged evidence truly has an independent source, courts ask whether the illegally obtained information affected (1) the magistrate's decision to issue the warrant, or (2) the decision of the state agents to seek the warrant.[14]

But where the "illegal search in no way contributed to the issuance of the warrant and police would have sought the warrant even absent the initial illegality, then the evidence is admissible through the lawful warrant under the independent source doctrine."[15]

---

[10] In re LaBelle, 107 Wn.2d 196, 219, 728 P.2d 138 (1986) (citing State v. Holland, 98 Wn.2d 507, 514, 656 P.2d 1056 (1983)).

[11] Hilton, 164 Wn. App. at 89 (citing Hill, 123 Wn.2d at 644).

[12] State v. Miles, 159 Wn. App. 282, 291, 244 P.3d 1030 (2011) (citing State v. Gaines, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005)).

[13] Id.

[14] State v. Betancourth, 190 Wn.2d 357, 365, 413 P.3d 566 (2018) (citing Murray v. United States, 487 U.S. 533, 542, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988)).

[15] Id.

Martinez-Castro challenges seven findings of fact related to the independent source doctrine.

First, finding of fact 8(c) is that the 2019 search warrant "sought the identical information sought in" the 2018 search warrant.[16]

Here, the only difference between the 2019 search warrant and the 2018 search warrant was that the former also sought evidence of "the motive for the murder, possession of the murder weapon, or current location of the murder weapon" and "[a]ny evidence tending to identify the shooter."[17] But both search warrants sought information pertaining to "[a]ny and all use of the [cell phone] on April 7, 2017 and/or April 8, 2017."[18] Because information pertaining to any and all use of the cell phone was sought by law enforcement to determine specific circumstances surrounding the murder, substantial evidence supports finding of fact 8(c).

Second, finding of fact 8(d) is that "[t]he [a]ffidavit in support of [the 2019 search warrant] did not rely in any way on the fruits of [the 2018 search warrant]. The fruits of [the 2018 search warrant] were not included in the affidavit in support of [the 2019 search warrant]."[19]

Here, Detective Coffey submitted the affidavit in support of the 2019 search warrant. In the affidavit, Detective Coffey explained his experience as a "regular"

---

[16] CP at 677, FF 8(c).

[17] Compare CP at 129 with CP at 528.

[18] Compare CP at 128-29 with CP at 528.

[19] CP at 677, FF 8(d).

user of the Cellebrite software and how the updated version of the software has the ability to take "an exact" copy of the device which "could include deleted data."[20] Detective Coffey also noted in his affidavit that in his opinion, the 2017 search of Martinez Castro's cell phone "may not have recovered and decoded all possible data . . . including . . . deleted data."[21] Because the information in the 2019 affidavit relies on Detective Coffey's personal experience using the Cellebrite software and makes no reference to the illegally obtained incriminating deleted text messages, substantial evidence supports the court's finding of fact 8(d).

Third, finding of fact 8(f) is that "Martinez-Castro is in no worse position at trial than he would have been in had [the 2018 search warrant] never been issued."[22]

Undisputed finding of fact 8(e) is that "[t]he information obtained from [the 2018 search warrant] had no impact on the magistrate's decision to authorize [the 2019 search warrant], as the magistrate was unaware of the fruits of [the 2018 search warrant]."[23] Because the magistrate who issued the 2019 search warrant was unaware of the incriminating deleted text messages that the 2018 search warrant uncovered, substantial evidence supports finding of fact 8(f).

Fourth, finding of fact 8(g) is that "[t]he State did not take tainted evidence and use it to get more evidence. Rather, the [S]tate took valid evidence that

---

[20] CP at 513.

[21] Id.

[22] CP at 678, FF 8(f).

[23] Id.

wasn't communicated to the [c]ourt in an appropriate way and recommunicated that same evidence to the [c]ourt in an appropriate way to get the same search accomplished."[24]

Undisputed finding of fact 8(a) is that the State became "concerned that [the 2018 search warrant] was potentially problematic under the law. Considering this [c]ourt's findings regarding [the 2018 search warrant], these concerns were reasonable[, and the State] accordingly requested that Detective Coffey seek another search warrant for Martinez-Castro's cell phone to fix potential flaws with [the 2018 search warrant]."[25] And unchallenged finding of fact 8(b) is that "[t]he State's motive to seek [the 2019 search warrant] was to correct potential errors in the language in the affidavit in support of [the 2018 search warrant]."[26] Substantial evidence supports finding of fact 8(g).

Fifth, the next two findings Martinez-Castro challenges, findings of fact 8(h) and 8(i), pertain to the court's application of State v. Betancourth[27] as an analogous case. Finding of fact 8(h) is that "Martinez-Castro's case is factually similar" to Betancourth, and finding of fact 8(i) is that the facts in Betancourth "are almost precisely the facts presented in Martinez-Castro's case."[28] To the extent these two "findings" are actually part of the trial court's analysis of the legal

---

[24] CP at 678, FF 8(g).

[25] CP at 677, FF 8(a).

[26] CP at 677, FF 8(b).

[27] 190 Wn.2d 357, 413 P.3d 566 (2018).

[28] CP at 678.

question whether the independent source doctrine applied here, we review them as conclusions of law.[29]

In Betancourth, the Yakima County District Court granted a search warrant in 2012 ordering Verizon Wireless to provide Betancourth's cell phone records "including text messages" sent or received during the timeframe of the crime.[30] After obtaining the records, a Toppenish police officer uncovered incriminating messages Betancourth had sent to his girlfriend.[31] About a year later, the Yakima Superior Court ruled that only superior courts were permitted to issue warrants for records of out-of-state companies.[32] As a result, a Toppenish detective submitted an affidavit that "was essentially identical to the affidavit" used in support of the previous warrant and in 2013 requested another search warrant from the superior court.[33] The superior court granted the 2013 warrant.[34] Our Supreme Court denied Betancourth's motion to suppress the incriminating messages because the independent source doctrine applied.[35]

The court reasoned:

---

[29] Casterline v. Roberts, 168 Wn. App. 376, 381, 284 P.3d 743 (2012) (citing Hegwine v. Longview Fibre Co., Inc., 132 Wn. App. 546, 556, 132 P.3d 789 (2006)).

[30] Betancourth, 190 Wn.2d at 360-61.

[31] Id. at 361.

[32] Id.

[33] Id. at 361-62.

[34] Id. at 362.

[35] Id. at 365-66.

> The purpose of the independent source doctrine is met here because Betancourth's text messages were required to be produced under the valid 2013 superior court warrant, which was untainted by any prior illegality. Toppenish police did not gain any information from the phone records initially supplied in response to the 2012 district court warrant that led them to seek the 2013 superior court warrant. Nor was the magistrate's decision to issue the 2013 superior court warrant affected by, or made in reliance on, information obtained from the illegal search.[36]

Here, Martinez-Castro's incriminating text messages were required to be produced under the valid 2019 warrant. Federal Way police officers gained information from the deleted messages initially supplied by the 2018 warrant but the affiant of the 2019 warrant, Detective Coffey, had no knowledge of the illegally obtained messages and did not refer to them in his affidavit, and the magistrate's decision to issue the 2019 warrant was not made in reliance on the information obtained from the illegal 2018 search. In this sense, this case is factually similar to Bentancourth. Findings of fact 8(h) and 8(i) are not erroneous.

Finally, challenged finding of fact 8(k) is that "[t]he [i]ndependent [s]ource doctrine[ a]pplies in the instant case, and the [third search warrant] is valid."[37] We also review this finding as a conclusion of law.

In its oral decision, the court noted that in order to determine whether challenged evidence has an independent source, "the [c]ourt has to ask whether illegally obtained information . . . affected the judge's decision to issue the

---

[36] Id. at 370.

[37] CP at 678, FF 8(k).

subsequent warrant, or the decision of the state agents to seek the warrant."[38] First, unchallenged finding of fact 8(e) notes that the magistrate who issued the 2019 search warrant "was unaware of the fruits of [the 2018 search warrant]."[39] Second, initially, the court acknowledged that the "data" in response to the 2018 warrant was "illegally obtained information," and that affected the State's "decision to seek" the 2019 warrant because "the 2018 warrant was potentially problematic under the law."[40] But the court's undisputed finding of fact 8(b) confirms that the motivation of the State to seek the third warrant "was to correct potential errors in the language" in the affidavit in support of the 2018 search warrant.[41] "Finding of fact" 8(k) reflects a proper analysis of the independent source doctrine.

Martinez-Castro argues that the prosecutor would not have requested the third warrant "but for" knowing the second warrant revealed incriminating deleted text messages. Therefore, Martinez-Castro contends the prosecutor was necessarily "motivated" by the knowledge of the results of the tainted second warrant in violation of the independent source doctrine. But Martinez-Castro's argument distorts the "motivation" requirement of the independent source doctrine. And in State v. Mayfield, our Supreme Court rejected a similar argument.[42]

---

[38] RP (Sept. 26, 2019) at 524.

[39] CP at 677, FF 8(e).

[40] RP (Sept. 26, 2019) at 524-25.

[41] CP at 677, FF 8(b).

[42] 192 Wn.2d 871, 434 P.3d 58 (2019).

In Mayfield, our Supreme Court acknowledged that arguably, in Betancourth, "the original defective warrant was a distant 'but for' cause of discovering the evidence because the State did not seek the second warrant until it discovered the defect in the first one."[43] But the court agreed with the outcome in Betancourth because "Washington's exclusionary rule does not operate on a strict 'but for' causation basis,"[44] and "the evidence itself was untainted because the second, valid warrant was a truly independent source. '[T]he illegal search [pursuant to the defective warrant] in no way contributed to the issuance of the [valid] warrant and police would have sought the warrant even absent the initial illegality.'"[45] As in Betancourth, and consistent with Mayfield, here, the "motivation" of the State remained unchanged in seeking the 2019 warrant.[46] For

---

[43] Id. at 890.

[44] Id. at 888.

[45] Id. at 890 (alterations in original) (quoting Betancourth, 190 Wn.2d at 365). "Some cases applying the independent source doctrine have held that even though official misconduct was arguably a 'but for' cause of the discovery of evidence, the evidence was nevertheless admissible." Id. at 889.

[46] See Hilton, 164 Wn. App. at 89-93 (the appellate court held that "[i]n its findings, the trial court correctly focused on the facts of the investigation to determine that the derivative evidence was discovered independent of the original search warrant."); see also Segura v. United States, 468 U.S. 796, 813-14, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) (the Court noted that "[w]hether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized"); Murray v. United States, 487 U.S. 533, 541, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) ("Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply.").

purposes of the independent source doctrine, the State's "motivation" was to gain any and all information relevant to the murder from Martinez-Castro's cell phone. Even though the State would not have sought the 2019 search warrant "but for" its concerns about the 2018 search warrant's illegality, the independent source doctrine applies.

II.  Miranda Warnings

Martinez-Castro argues that his statements to law enforcement were "inadmissible products of police coercion."[47]  We review findings of fact entered after a CrR 3.5 hearing for substantial evidence.[48]

"In determining whether any part of the Miranda rule has been complied with, we must look to the trial court's findings to determine what occurred."[49]  "The inquiry is whether, under the totality of the circumstances, the confession was coerced."[50]  "In assessing the totality of the circumstances, a court must consider any promises or misrepresentations made by the interrogating officers."[51]  "Some

---

[47] Appellant's Br. at 31.

[48] State v. Nysta, 168 Wn. App. 30, 40, 275 P.3d 1162 (2012) (citing State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997)).

[49] State v. Cashaw, 4 Wn. App. 243, 247, 480 P.2d 528 (1971).

[50] Broadaway, 133 Wn.2d at 132 (citing Arizona v. Fulminante, 499 U.S. 279, 285, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)).

[51] Id. (citing United States v. Springs, 17 F.3d 192, 194 (7th Cir. 1994); United States v. Walton, 10 F. 3d 1024, 1028-29 (3d Cir. 1993)).

of the factors considered in the totality test include the defendant's physical condition, age, mental abilities, physical experience, and police conduct."[52]

Miranda "requires the expression of an objective intent to cease communication with interrogating officers."[53] But "Miranda does not require that a waiver of Miranda rights be in writing. It requires only that the waiver be made 'voluntary, knowingly, and intelligently.'"[54] "The meaning of the words 'voluntary,' 'knowingly,' and 'intelligently' overlap. Their common thrust, however, is directed to the existence of free choice on the part of the accused, that is, a waiver with knowledge of Miranda rights without compulsion and by one mentally and physically capable of exercising such choice."[55]

Martinez-Castro challenges four findings of fact related to Miranda warnings.

First, Martinez-Castro challenges two findings of fact related to whether Detective Castro's interrogation tactics invalidated Martinez-Castro's waiver of his Miranda rights. Finding of fact 13 is that at one point during interrogation, Detective Castro referred to Miranda warnings as "formal stuff," and that reference did not invalidate Martinez-Castro's waiver that he provided initially to Officer

---

[52] State v. Burkins, 94 Wn. App. 677, 694, 973 P.2d 15 (1999) (citing State v. Aten, 130 Wn. 2d 640, 664, 927 P.2d 210 (1996)).

[53] State v. Piatnitsky, 180 Wn.2d 407, 412, 325 P.3d 167 (2014).

[54] Cashaw, 4 Wn. App. at 248.

[55] Id.

Gregson and later to Detective Castro.[56]  Finding of fact 20 is that several times during interrogation, Detective Castro asked Martinez-Castro if "he had anything further to say," and he consistently answered "No," but that exchange never constituted an unequivocal invocation of Miranda.[57]

The court's undisputed finding of fact 6 is that "[r]egarding the advisements provided by Officer Gregson, Martinez-Castro clearly manifested his understanding of his rights and his willingness to talk."[58]  And undisputed findings of fact 9 and 10 are that Detective Castro read Martinez-Castro his Miranda warnings for a second time, and the second advisement was "consistent with the law and requirements of Miranda."[59]

And Detective Castro testified that during interrogation, when she asked Martinez-Castro if he "had anything else [he wanted] to add," she did so in the context of the information he previously provided.[60]  The court noted that although it found Detective Castro's testimony to be "less credible," undisputed finding of fact 18 is that most of the interactions between Martinez-Castro and "law enforcement were recorded, and the [c]ourt had the ability to rely on the recordings and not, for the most part, the memory of Detective Castro as she recounted these events.  The [c]ourt therefore does not find the concerns about

---

[56] CP at 698, FF 13.

[57] CP at 699, FF 20.

[58] CP at 697, FF 6.

[59] CP at 698, FF 9, 10.

[60] RP (Sept. 17, 2019) at 52-53.

17

Detective Castro's credibility to be dispositive."[61]  Substantial evidence supports findings of fact 13 and 20.

Martinez-Castro also challenges two findings of fact related to the voluntariness of his Miranda waiver.  Finding of fact 12 is that Martinez-Castro "was properly advised of his rights and knowingly, freely, intelligently, and voluntarily waived his rights."[62]  Finding of fact 21 includes that "Martinez-Castro's statements were voluntarily made,"[63] that an officer's "psychological ploy . . . may play a part in a suspect's decision to confess,"[64] and that there were no "threats, coercions, or promises made, at least not that exceeded the lawful scope of a police interrogation."[65]

Here, when Officer Gregson first made contact with Martinez-Castro in the parking lot, he testified that he read Martinez-Castro his constitutional rights from the department-issued Miranda card.  Officer Gregson also stated that the department-issued card lists the Miranda advisements "verbatim," and that he uses it in the "same way with every person [he mirandizes]."[66]  Immediately after reading Martinez-Castro his Miranda warnings, Officer Gregson asked Martinez-Castro if he understood "each of [the] rights," and Martinez-Castro "acknowledged

---

[61] CP at 698, FF 18.

[62] CP at 698, FF 12.

[63] CP at 699, FF 21.

[64] CP at 699, FF 21(a).

[65] CP at 700, FF 21(b).

[66] RP (Sept. 18, 2019) at 116.

his rights [and] stated he understood them."[67]  When Officer Gregson asked

Martinez-Castro if he was "willing to talk," Martinez-Castro answered

affirmatively.[68]  Officer Gregson testified that he never made "any sort of promises

to try to get [Martinez-Castro] to talk."[69]  Undisputed finding of fact 3 is that Officer

Gregson's "advisement was proper and legally accurate under Miranda."[70]

Additionally, at the beginning of the interrogation, after confirming Martinez-

Castro's identity, contact information, and advising him that the interview was

being recorded, Detective Castro testified that she reread Martinez-Castro his

Miranda warnings.  Detective Castro then asked, "And having these rights in mind,

do you wanna talk to me?"[71]  Martinez-Castro replied, "Sure."[72]  He then signed a

written waiver.  Throughout the interrogation, Detective Castro testified that she

did not make any promises to Martinez-Castro in an effort to persuade him to

confess.  Detective Novak confirmed that during interrogation, there were not any

"threats or promises" made to Martinez-Castro "off camera."[73]  And Detective

Howell testified that during his interview with Martinez-Castro, he never made

Martinez-Castro any promises so that he would talk, nor did he "make any threats

---

[67] Id. at 119.

[68] Id.

[69] Id. at 121.

[70] CP at 697, FF 3.

[71] Pretrial Ex. 3 at 5.

[72] Id.

[73] RP (Sept. 17, 2019) at 97.

19

or coerce him."[74] The court found Officer Gregson and Detective Howell credible. And the court's oral findings state that when balancing Martinez-Castro's "youthfulness" and "inexperience with the system" against "the tone and demeanor of the officers," that based upon the totality of the circumstances, Martinez-Castro "was not overborne by the tactics used by law enforcement."[75] Substantial evidence supports findings of fact 12 and 21.

The court's legal conclusion that "the State has proven by a preponderance of the evidence that there was proper advisement of <u>Miranda</u> warnings, that the ensuing conversation was voluntary, and that it was a product of a knowing, intelligent, and voluntary waiver of <u>Miranda</u> rights by Martinez-Castro" is supported by the court's findings of fact 12, 13, 20, and 21.[76] The court properly concluded that Martinez-Castro's statements while speaking to Officer Gregson on the phone prior to his arrest, his statements made to Officer Gregson, and his statements made during the audio and video recorded interrogation until he invoked his right to counsel were admissible.

Martinez-Castro argues that Detective Castro and Detective Howell engaged in "unacceptable coercion by implicitly threatening Martinez-Castro's family"[77] and by "implicitly [threatening him] with life in prison if he did not submit to

---

[74] RP (Sept. 18, 2019) at 205.

[75] <u>Id.</u> at 261.

[76] CP at 700, FF 22. Martinez-Castro also challenges finding of fact 22. Because finding of fact 22 is a conclusion of law mislabeled as a finding of fact, we treat finding of fact 22 as a conclusion of law.

[77] Appellant's Br. at 36-38.

questioning."[78]  Detective Castro admitted that she brought up Martinez-Castro's mother during the interview to appeal to "his emotional side," and that she discussed potential crimes he could be charged with in an attempt to make him "talk."[79]  But "[d]eception alone does not make a statement inadmissible as a matter of law; rather, the inquiry is whether the deception made the waiver of constitutional rights involuntary."[80]  Because Martinez-Castro consistently invoked his rights throughout the interrogation, the officers' deceptive tactics did not render the waiver of Martinez-Castro's <u>Miranda</u> rights involuntary.

Martinez-Castro contends that because article I, section 9 of the Washington Constitution provides more protection than the Fifth Amendment, we should engage in a <u>State v. Gunwall</u>[81] analysis and find that article I, section 9 requires that an "intelligent waiver of rights required giving Martinez-Castro some indication of the suspected offense."[82]  But in <u>State v. Wheeler</u>, our Supreme Court held that article I, section 9 of the Washington Constitution is "identical in scope to the Fifth Amendment."[83]  The trial court correctly noted that article I, section 9

---

[78] Appellant's Br. at 44.

[79] RP (Sept. 17, 2019) at 54.

[80] <u>Burkins</u>, 94 Wn. App. at 695 (citing <u>State v. Gilcrist</u>, 9 Wn.2d 603, 607, 590 P.2d 809 (1979)).

[81] 106 Wn.2d 54, 720 P.2d 808 (1987).

[82] Appellant's Br. at 41.

[83] 108 Wn.2d 230, 240, 737 P.2d 1005 (1987) (citing <u>State v. Franco</u>, 96 Wn.2d 816, 829, 639 P.2d 1320 (1981); <u>State v. Foster</u>, 91 Wn.2d 466, 473, 589 P.2d 789 (1979)).

"does not lend additional expanded protections above and beyond what are lent by the Fifth Amendment."[84]  We need not engage in another Gunwall analysis.

## III.  Prosecutorial Misconduct

In reviewing a claim of prosecutorial misconduct, we "must consider the comments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury."[85]

To prevail on a claim of prosecutorial misconduct, the defendant must establish the "impropriety" of the prosecutor's comments in addition to their prejudicial effect.[86]  "To establish prejudice, the defendant must demonstrate that there is a substantial likelihood that the misconduct affected the jury's verdict."[87]  But where a defendant does not object at trial, "reversal is unwarranted unless the objectionable remark 'is so flagrant and ill intentioned that it causes an enduring

---

[84] RP (Sept. 18, 2019) at 241.  See State v. Moore, 79 Wn.2d 51, 57, 483 P.2d 630 (1971) (holding that the "Washington constitutional provision against self-incrimination envisions the same guarantee as that provided in the federal constitution.  There is no compelling justification for its expansion."); State v. Earls, 116 Wn.2d 364, 378, 805 P.2d 211 (1991) (holding that the "slight difference in wording between [article I, section 9, and the Fifth Amendment] has been held to be nondeterminative, even in a context where the words "evidence" and "witness" commonly express the precise distinction involved") (citing id. at 56-57).

[85] State v. Edvalds, 157 Wn. App. 517, 522, 237 P.3d 368 (2010) (citing State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

[86] State v. Schlichtmann, 114 Wn. App. 162, 167, 58 P.3d 901 (2002) (citing State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

[87] Id.  (citing Brown, 132 Wn.2d at 561).

and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'"[88]

Martinez-Castro contends that the prosecutor erred because during rebuttal, he made "repeated references to jurors' emotions, and the [prosecutor's] instruction that they discuss them in deliberations amounted to an underhanded attempt to appeal to jurors' emotions."[89]

In rebuttal, the prosecutor stated:

> Now, in your jury instructions, the last paragraph of Jury Instruction Number 1 reads, as a juror, you are an officer of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not by sympathy, prejudice, or personal preference. To assure that all parties receive a fair trial, you must act impartially, with an earnest desire to reach a proper verdict.
>
> This is a very serious circumstance. We are all human beings, and each one of us will have sympathy and emotion. Defense put on the screen for you a photograph of Mr. Martinez-Castro when he was a little kid. Mr. Martinez-Castro is young, and you're being asked to make a very serious decision, a decision, which sympathy and emotion, as a human being, are going to factor in. Pedro is dead. His family has lost a brother, a cousin, a son. He is dead. You, when you go back, should talk about your emotions, talk about your sympathy for everybody involved in this case.
>
> Be open and honest about your feelings. Be open and honest about them so that your other fellow jurors know them, and when it comes time to decide, when it comes time to step back and evaluate the actual evidence, to put those emotions aside, and make your decision based only on the evidence, not on your emotion or your sympathy.[90]

---

[88] State v. Reed, 168 Wn. App. 553, 557, 278 P.3d 203 (2012).

[89] Appellant's Br. at 55.

[90] RP (Oct. 23, 2019) at 2660-661.

23

Here, in his rebuttal argument, the prosecutor acknowledged the human tendency to make a decision based on emotion. The prosecutor asked the members of the jury to discuss and acknowledge their emotions regarding the case but explicitly stated that "when it comes time to decide . . . and evaluate the actual evidence, . . . put those emotions aside and make your decision based only on the evidence, not on your emotion or your sympathy."[91]

Martinez-Castro contends that the prosecutor's conduct here is similar to the prosecutor's conduct in State v. Craven.[92] In Craven, during closing argument, the prosecutor "told the jurors they would know Craven's guilt beyond a reasonable doubt by, in equal measure, recognizing it intellectually and feeling it emotionally in their hearts and viscerally in their guts."[93] This court held that the prosecutor committed misconduct by inviting "jurors to give the same weight to their rationality as to their emotions and instincts."[94] A prosecutor "acts improperly by seeking a conviction based upon emotion rather than reason."[95]

Here, the prosecutor explicitly told the jury to "act on reason" and not "let their emotions overcome [their] rational thought process" during deliberation.[96]

---

[91] Id. at 2661.

[92] 15 Wn. App. 2d 380, 475 P.3d 1038 (2020), review denied, 197 Wn.2d 1005, 483 P.3d 784 (2021).

[93] Id. at 387.

[94] Id. at 388.

[95] Id. at 385 (citing State v. Echevarria, 71 Wn. App. 595, 598, 860 P.2d 420 (1993)).

[96] RP (Oct. 23, 2019) at 2660.

Taken in context, it is troubling that the prosecutor made the risky suggestion that the jurors should acknowledge and discuss their emotions and sympathies because that could be viewed as an attempt to amplify and emphasize those emotions and sympathies. But Martinez-Castro failed to object to the prosecutor's statements. Because a timely objection followed by an immediate curative instruction would have blunted any inappropriate connotation from the prosecutor's rebuttal argument, we conclude that reversal is unwarranted.

Therefore, we affirm.

_____

WE CONCUR:

_____  Andrus, A.C.J.